Kevin R. BLACK, Plaintiff–Appellee,

v.

Al C. PARKE, et al., Defendants,

Kenneth Case, Walt Chapleau, and Tom Campbell, Defendants–Appellants.

No. 92–5915.

United States Court of Appeals,
Sixth Circuit.

Submitted April 30, 1993.

Decided Sept. 9, 1993.

Kevin R. Black (briefed), pro se.

Barbara W. Jones (briefed), Office of the Gen. Counsel, Frankfort, KY, for defendants-appellants.

Before: JONES and BATCHELDER, Circuit Judges; and CELEBREZZE, Senior Circuit Judge.

BATCHELDER, Circuit Judge.

Plaintiff-appellee Kevin R. Black brought suit against several prison officials at the Kentucky State Reformatory (KSR) under 42 U.S.C. § 1983, alleging that he was deprived without due process of law of his liberty interest of residing in the general prison population. The district court denied qualified immunity to the officials, and the officials now appeal that denial. For the reasons outlined below, we affirm the district court's denial of qualified immunity to these officials because there is a genuine issue of material fact as to whether Black received all the process due him.

## I.

During the time of the events that led up to this suit, Kevin Black was serving a prison term at KSR on various state offenses. On December 17, 1985, Black was found guilty by a prison Adjustment Committee of the institutional offense of possessing or promoting dangerous contraband. On January 16, 1986, plaintiff was transferred to the Kentucky State Penitentiary (KSP). After only several hours at that prison, Black asked to be placed in protective custody because he believed that his life was in danger. The institution complied. On February 24, 1986, Black was involved in a fight with another inmate while in protective custody. As a result, the institution put Black in the behavioral custody unit at KSP. On March 21, 1986, Black was attacked by another inmate. He then was placed in administrative segregation [1] for his own safety.

On July 2, 1986, Black was transferred back to the KSR so that he could appear in state court on another state charge and could await out-of-state transfer. He was placed in administrative segregation at KSR. On July 16, 1986, Black was transferred to a West Virginia facility because the Corrections Department believed that it was unable to keep him safe in Kentucky facilities.

On October 6, 1986, Black returned to KSR from West Virginia pursuant to a state court order. He remained in administrative segregation on "hold ticket" status from October 6, 1986, through January 12, 1987. Although the record does not provide a clear definition of "hold ticket" status, apparently

---

1. In the Kentucky correctional system, administrative segregation is segregation from the general prison population, consisting of confinement to a cell, room or highly controlled area to ensure the safety of the institution, staff or the population, or pending investigation of a serious felony for which the inmate is a suspect. Kentucky Corrections Policies and Procedures 10.-2(IV)(B). Apparently, administrative segregation is, at least to some extent, synonymous with the term "lock-down."

"hold ticket" status applies to inmates who have just been transferred into the prison facility and are awaiting court proceedings on other charges or are awaiting a transfer to another facility. On January 12, 1987, Black was transferred for pre-trial evaluation to the Kentucky Correctional Psychiatric Center and remained there until March 13, 1987. On March 13, he was returned to KSR and placed in administrative segregation again. In June of 1987, he was transferred back to West Virginia after the state court dismissed the pending criminal charges against him without prejudice.

In April of 1988, Black was brought back to KSR. On April 15, 1988, he received a hearing before the Adjustment Committee in response to his grievance about his segregation. He remained on "hold ticket" status in lock-down from April 13, 1988, until July 22, 1988. On July 22, 1988, Black was transferred to the KSP for permanent housing.

Black brought this action against seven prison officials under 42 U.S.C. § 1983, seeking $80,000 in compensatory and punitive damages; a declaration that defendants' conduct was unconstitutional; and a preliminary and permanent injunction.[2] Plaintiff alleges that defendants violated his state-created liberty interest by placing him in administrative segregation on "hold ticket" status for extended periods of time without due process. The district court denied summary judgment to defendants on this due process claim, holding that Black had a liberty interest created by state Corrections Department policies; that the prison initially had a right to put him in lock-down for his own safety; that after that, he was given some of the process required to be kept in lock-down; but that a trial was necessary to determine the adequacy of the periodic status reviews.[3]

After defendants filed a motion for clarification, the district court issued a clarifying order, stating that Corrections Policy and Procedure 10.2 (CPP 10.2) grants all inmates a liberty interest in living in the general prison population. It also stated that the defendants were not entitled to qualified immunity because it was unclear if they intentionally kept Black in administrative custody in conscious disregard of his CPP 10.2 rights. It noted that only defendants Kenneth Case, Unit-D Manager of KSR; Tom Campbell, Deputy Warden of KSR; and Walt Chapleau, Unit-D Manager of KSR, remain as defendants because they are the only ones implicated in this remaining issue. These three defendants now appeal the district court's denial of qualified immunity to them.

## II.

Defendants argue that state correctional policies do not create a liberty interest in being placed in the general prison population, and that even if they did, Black received all the process required before he was deprived of that interest. Defendants maintain that they are entitled to qualified immunity because the law is not so clearly established that they would have known that their conduct was unlawful.

We have jurisdiction over the qualified immunity issue in this case because orders denying summary judgment on the basis of qualified immunity are immediately appealable as "final judgments" under the collateral order doctrine. 28 U.S.C. § 1291; *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). Qualified immunity is a question of law for the district court, and therefore we review the denial of qualified immunity *de novo. Hall v. Shipley,* 932 F.2d 1147, 1150 (6th Cir.1991).

Government officials "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). For a

---

**2.** On May 19, 1992, Black was paroled. Therefore, his request for preliminary and permanent injunctive relief is moot.

**3.** The district court granted summary judgment for defendants as to plaintiff's claim of violation of his right to be free from cruel and unusual punishment and his claim of retaliatory harassment. Plaintiff has not appealed the granting of summary judgment as to these claims.

constitutional right to be clearly established, "the law must be clear in regard to the official's particular actions in the particular situation." *Long v. Norris,* 929 F.2d 1111, 1114 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 187, 116 L.Ed.2d 148 (1991). This requires that

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citations omitted). This "objective reasonableness" standard focuses on whether defendants reasonably could have thought that their actions were consistent with the rights that plaintiff claims have been violated. *Garvie v. Jackson,* 845 F.2d 647, 649 (6th Cir. 1988) (citing *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3038).

In inquiring whether a constitutional right is clearly established, we must "look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Daugherty v. Campbell,* 935 F.2d 780, 784 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992).

> [I]n the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself. In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law. For the decisions of other courts to provide such "clearly established law," these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.

*Ohio Civil Serv. Employees Ass'n v. Seiter,* 858 F.2d 1171, 1177 (6th Cir.1988). Thus, it is only in extraordinary cases that we can look beyond Supreme Court and Sixth Circuit precedent to find "clearly established law."

The Supreme Court has noted that because qualified immunity is "'an immunity from suit rather than a mere defense to liability,' we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* —— U.S. ——, ——, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991) (quoting *Mitchell v. Forsyth,* 472 U.S. at 526, 105 S.Ct. at 2815) (per curiam). This Circuit, too, has held that the issues of objective reasonableness and what is clearly established law are to be decided before trial. "Since the question is one of law, the trial court could not, by characterizing it as a disputed factual issue, avoid deciding [the issue]. The source for such determination is, of course, in federal constitutional, statutory or case law existing at the time. Any decision of the trial court should indicate that law and state the basis for its conclusion." *Dominque v. Telb,* 831 F.2d 673, 677 (6th Cir. 1987). However, if genuine issues of material fact exist as to whether the defendants actually did commit acts that would violate a clearly established right, then summary judgment on qualified immunity is improper. *Poe v. Haydon,* 853 F.2d 418, 426 (6th Cir. 1988), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989).

### III.

Although this case is properly before us on interlocutory appeal of the qualified immunity determination, we cannot confine our review to the qualified immunity defense alone. In *Carlson v. Conklin,* 813 F.2d 769 (6th Cir.1987), we held that we first must decide whether the plaintiff has stated a section 1983 claim against the individual defendants before addressing the qualified immunity question. "If the plaintiff here has failed to state a § 1983 claim, [the defendant's] qualified immunity defense becomes moot." *Id.* at 771. Thus, we must first examine whether plaintiff has stated a claim against the prison

officials. If Black has stated a claim, then we must examine whether summary judgment is warranted on the grounds of qualified immunity.

*A. Has Black stated a claim?*

*1. Liberty interest*

■ Black does not complain about his administrative segregation assignments at KSP or KSR that were made to protect his own safety. Instead, Black complains about his later segregation assignments when, pending his transfer to an out-of-state institution, he was retained as a "hold ticket" inmate in lock-down at KSR from October of 1986 until January 12, 1987; from March 13, 1987, to June 4, 1987; and from April 13, 1988, until July 22, 1988.

In *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court held that although the Due Process Clause does not confer the right to be part of the general prison population, state regulations "may create a liberty protected by the Due Process Clause." *Id.* at 469, 103 S.Ct. at 870. A regulation confers this right when it constitutes more than a simple procedural guideline and uses "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed ... and that administrative segregation will not occur absent specified substantive predicates—viz., 'the need for control,' or 'the threat of a serious disturbance.'" *Id.* at 471, 103 S.Ct. at 871. *See also, Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989) (state regulations must use mandatory language and put substantive limits on official); *Dell'Orfano v. Romano,* 962 F.2d 199, 203 (2d Cir.1992) (mandatory procedures for administrative segregation create liberty interest).

Kentucky's Corrections Policies and Procedures 10.2 (CPP 10.2) covers special management programs for the prisons, including administrative segregation. CPP 10.2(IV)(B) defines administrative segregation as follows:

Administrative segregation is segregation from the general population for relatively short periods of time. It may consist of confinement to a cell, room or highly controlled area to ensure the safety and security of the institution, the staff or general inmate population or pending investigation of a serious felony where the inmate is a suspect. Prior to housing an inmate in administrative segregation, there *must* be a hearing at which due process is afforded in accordance with CPP 15.6.

CPP 10.2(IV)(B) (emphasis added). The criteria for assignment to a special segregation program are set out in CPP 10.2(VI)(A)(1), which reads:

A. Criteria for Assignment

1. General

a. With the exception of the Special Security Unit, all inmates *will* be afforded a due process hearing before the Classification or Adjustment Committee before being assigned to any special management program. This, however, does not preclude placing the inmate in administrative segregation and/or prehearing detention pending a hearing before the Classification or Adjustment Committee when it is determined that he constitutes a threat to other inmates, staff members or himself. In these cases, a pre-detention hearing *must* be ordered in writing by the shift supervisor in accordance with CPP 15.6.

CPP 10.2(VI)(A)(1) (emphasis added).

The length of stay for, and release from, special management programs is covered by CPP 10.2(VI)(F)(4):

4. Administrative Segregation

a. Inmates may be initially assigned to administrative segregation for a *maximum* period of seven days at the end of which time the inmate's status *shall* be reviewed by the Classification Committee. Depending upon the circumstances at that time, the committee may release the inmate to the general population, assign [the inmate] to an appropriate special management unit or retain the inmate in administrative segregation an additional seven days. The committee *shall* review the inmate every seven days for the first sixty days. If at the end of the first thirty days, the Classifi-

cation Committee determines that additional time in administrative segregation is necessary, the inmate concerned *shall* have psychological assessment including an interview with the psychologist to ensure the mental health of inmate so assigned. At the end of a total of sixty days in administrative segregation, the inmate *shall* either be released to the general population or assigned by the Adjustment Committee to the Administrative Control Unit or other special management unit.

b. Criteria for Release from Administrative Segregation.

An inmate *shall* be released from administrative segregation when:

(1) Circumstances requiring the assignment are no longer valid.

(2) An investigation, which requires the assignment, is completed or indicates that such continued assignment serves no valid purpose.

(3) Mental health assessments indicate that continued assignment to the unit will have a serious adverse psychological impact on the inmate concerned....

CPP 10.2(VI)(F)(4) (emphasis added).

As the district court correctly found, these state prison regulations create a liberty interest in being placed in the general prison population. The regulations use the mandatory language required in *Hewitt* by using the words "shall" and "must" in describing the procedural requirements for administrative segregation. They also provide the substantive limits required in *Hewitt* by stating that inmates shall have due process hearings and that inmates shall be released from segregation when certain circumstances have been met.

In addition, as the district court correctly found, "hold-ticket" inmates such as Black are covered by these segregation procedures because the broad prison regulations do not exclude those on "hold ticket" status. This finding is buttressed by a December 3, 1986, memo to the warden from prison officials discussing Black's grievance about his segregation and responding to the warden's request that the procedure for administrative

segregation of hold-ticket inmates be clarified. The memo indicates that hold-ticket inmates are covered by the general administrative segregation procedures:

[E]xisting policy and procedure ... already addresses any inmate assigned to the Special Management Unit which would include inmates on hold tickets from instate, out-of-state, and federal institutions ... [A]ll inmates are covered by the fact that all inmates assigned to the Special Management unit are afforded certain privileges regardless of their status....

Therefore, plaintiff Black clearly had a liberty interest created by the state prison regulations.

### 2. *Process required*

Because Black had a liberty interest in remaining in the general prison population, prison officials had to afford him due process in order to deprive him of that right. *Hewitt* makes it clear, however, that the procedural due process required before one may be deprived of a liberty interest is governed by federal constitutional law and not state law, and that minimal process is required for segregation in the prison context because prison officials must be accorded " 'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order....' " 459 U.S. at 472, 103 S.Ct. at 872 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979)). Prison officials are "obligated to engage only in an informal, nonadversary review of the information supporting respondent's administrative confinement, including whatever statement respondent wished to submit, within a reasonable time after confining him to administrative segregation." *Id.*

The *Hewitt* Court held that an inmate need only receive some notice of the charges against him and an opportunity to present his views either in writing or in person to the prison official, and a review by the decisionmaker of the charges and the available evidence. *Id.* at 476, 103 S.Ct. at 874. This process must occur within a "reasonable time" following an inmate's transfer, judged from the view of the "insubstantial private

interest" of the inmate and the "traditionally broad discretion" of prison officials. *Id.* at 476 n. 8, 103 S.Ct. at 874 n. 8. However, administrative segregation may not be used as "pretext for indefinite confinement of an inmate." *Id.* at 477 n. 9, 103 S.Ct. at 874 n. 9. Therefore, "[p]rison officials must engage in some sort of periodic review of the confinement of such inmates. This review will not necessarily require that prison officials permit the submission of any additional evidence or statements." *Id.* Thus, although *Hewitt* involved segregation of an inmate for his role in a prison riot, the case holds that regardless of the reason for the segregation, inmates in segregation are entitled only to minimal procedural process, so long as that process is not pretextual.

In contrast to *Hewitt* where the Pennsylvania prison regulations apparently did not set out in detail what process must be given segregated inmates, here Kentucky's Corrections Policies and Procedures set out regulations in mandatory language governing the specific procedures prison officials are required to use in reviewing segregation decisions. However, Black did not have a liberty interest in these more stringent state-created procedures. There is no constitutional violation when state actors fail to meet their own regulations, so long as the minimum constitutional requirements have been met. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (adequacy of procedures is matter of federal constitutional law); *Russell v. Coughlin*, 910 F.2d 75, 78 n. 1 (2d Cir.1990) (procedures for confinement in segregation governed by federal law); *Jackson v. Cain*, 864 F.2d 1235, 1252 (5th Cir.1989) (violation of rules alone may be state law violations but not necessarily constitutional violations). Thus, while the prison's own internal regulations required the officials to provide Black with this state-created process, the constitution required only that the officials meet the *Hewitt* procedural requirements. Accordingly, Black was entitled to 1) an "informal, nonadversary review" of the information supporting his segregation within a "reasonable time", 2) an opportunity to respond in writing or in person, and 3) periodic review of his confinement to assure that

the confinement was not pretextual. *Hewitt,* 459 U.S. at 472–77, 103 S.Ct. at 872–74.

### 3. Due process received?

■ The question then is whether Black received the constitutionally mandated process due him before being deprived of his liberty interest. We find that plaintiff Black has raised a genuine issue of material fact in that regard.

Black is proceeding *pro se*, and accordingly we must construe his complaint liberally. *Brooks v. Seiter,* 779 F.2d 1177, 1179–80 (6th Cir.1985) (*pro se* complaints must be read liberally). Nevertheless, on summary judgment, the non-moving party has the burden of setting forth "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The moving party has no obligation to file affidavits or other materials negating a claim on which his opponent bears the burden so long as the movant relies upon the absence of an essential element in the pleadings, depositions, or answers to interrogatories. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

As they do in their brief, defendants claim in their responses to plaintiff's interrogatories that they provided Black with all the process required by CPP 10.2:

> Contrary to Plaintiff's assertion, Plaintiff was afforded the process outlined in CPP 10.2, VI., A., 1., a.

> Mr. Black was afforded the process outlined in CPP 10.2 Section VI., A., 1., a. Mr. Black was placed in Administrative Segregation due to his being received on "hold ticket" from another correctional facility. Due to his hold ticket status a Pre–Hearing detention form was prepared upon his arrival with a Pre–Hearing review conducted by the Adjustment Committee within the prescribed time limits as per policy and procedure CPP 10.2 All documents relative to his Pre–Hearing Detentions have been provided Mr. Black in previous responses to his claims.

Answer 11 and Response 11 to Plaintiff's Request for Supplementation of Discovery

Responses Re: Fourth Set of Interrogatories and Attendant Request for Production of Documents.

This response, however, is not supported factually by any materials included in the record on appeal. The record's only evidence of a hearing is the partial transcript of the April 15, 1988, Adjustment Committee hearing. There is no other evidence in the record of what review Black received or whether he was given an opportunity to challenge his segregation.[4]

The defendants' legal conclusion that Black received all the process due him is countered by Black's affidavit attached to his response to defendants' motion for summary judgment. In it, Black asserts that he was told by prison official Kevin Shake in his cell on October 7, 1986, the day after he arrived back at KSR, that he was in segregation because he was "on hold" from an out-of-state institution. Black claims, "Beyond this proffered rationale, I was not afforded any due process protection." He goes on to say that he was "not given any opportunity to challenge their purported justification for my segregation" after he filed his grievance and defendants stated their reasons for the lockdown. He states that he "was not afforded an opportunity to challenge the decision to resume my administrative segregation assignment under 'lock down'" after he returned to KSR in March of 1987. He does admit that there was an April 15, 1988, Adjustment Committee hearing concerning his segregation, but states that "[b]eyond this hearing, I was not afforded any opportunity to challenge my segregation assignment. I

was confined under 'lock down' for 100 days during this period, and for 281 days total."

The process described in Black's affidavit would not suffice under *Hewitt*. Thus, Black, through his affidavit, has raised a genuine issue of material fact as to whether he received the process due him, and defendants have failed to counter Black's affidavit with anything but a legal conclusion that Black did receive all the process that was due.[5]

### B. Summary judgment warranted on qualified immunity?

Having found that there is a genuine issue of material fact as to the process Black received and accordingly as to whether Black has made out a claim, we then must examine whether summary judgment was warranted on the grounds of qualified immunity. Although defendants bear the initial burden of coming forward with facts to suggest that they were acting within the scope of their discretionary authority during the incident in question, the "ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity." *Washington v. Newsom*, 977 F.2d 991, 995 (6th Cir.1992) (quoting *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir.1991)), *cert. denied*, —— U.S. ——, 113 S.Ct. 1848, 123 L.Ed.2d 472 (1993). The plaintiff has the burden of establishing that "the defendants' conduct violated a right so clearly established that any official in defendants' positions would have clearly understood that they were under an affirmative duty to refrain from such conduct." *Id.* at 995.

4. Some indication about what process Black received may exist in defendants' response to plaintiff's first request for interrogatories. In that request, plaintiff asked for the dates on which he was afforded classification hearings while confined from October 6, 1986, until June 4, 1987, and all relevant documentation. Defendant's response was "See attached review sheets." Although the interrogatories and the defendants' responses to them are part of the record, the review sheets are not included in the record. Thus, we have no way of determining from the record what process Black received.

5. The district court found that plaintiff had received at least some of the process due him but that there was a question about the adequacy of

the periodic status reviews Black received. The district court found that defendants "assert" that plaintiff received reviews every seven days and psychological reviews between October 24, 1986, and May 29, 1987, and during his stay at KSP in April 1988 until July 22, 1988. It also noted that plaintiff exercised his right to file a grievance challenging his segregation lock-down status. It states that plaintiff "appealed to the warden and also was told on four different occasions why he was placed on lock down." However, the record before us contains no evidence supporting the assertion that Black received this process, and therefore, although this evidence may exist, we cannot agree that there is evidence in the record that Black received all the process due him.

Here, it was clearly established at the time of the alleged violations that Black had a state-created liberty interest and that he was entitled to the process set out in *Hewitt.* The prison officials have shown that they were acting within the scope of their discretionary authority in handling Black and his administrative segregation. Black then had the burden of showing that the defendants were *not* entitled to qualified immunity. As discussed above, we cannot determine from the record before the trial court whether the facts as to the kind and frequency of review given to Black are as he says they are or as the defendants say they are. Therefore a genuine issue of fact remains as to whether Black received the process required by *Hewitt.* Thus, summary judgment on the grounds of qualified immunity was not appropriate.[6]

### IV.

For the reasons outlined above, we affirm the judgment of the district court denying summary judgment on the basis of qualified immunity to defendants.

---

**6.** In denying summary judgment, the district court relied on *Sourbeer v. Robinson,* 791 F.2d 1094, 1101 (3d Cir.1986), *cert. denied,* 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 779 (1987), a Third Circuit case decided in 1986. There, the court denied qualified immunity to prison officials, finding that although the prison procedures were adequate and they were followed by officials, the reviews were perfunctory and thus denied Sourbeer a *meaningful* opportunity to be heard. *Id.* The court held that the district court's finding that the reviews were applied in a rote fashion was not clearly erroneous because there was support for this finding, in that half of Sourbeer's reviews noted his "hold" status as the reason for segregation and he was never given any psychological evaluation. *Id.*

The district court in this case stated that *Sourbeer* was instructive here because "the record does not, however, allow us to review the adequacy of the periodic status reviews plaintiff received." We question *Sourbeer's* applicability in this case because it was only decided in 1986, the first year for which Black claims a procedural due process violation. And, as *Sourbeer* is neither Supreme Court precedent nor a case from the Sixth Circuit we also question whether the case can be said to "both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting." *Ohio Civil Serv. Employees Ass'n v. Seiter,* 858 F.2d at 1177.

We conclude, however, that we need not reach the pretext/rote review issue because we find that there is insufficient evidence in the record to refute Black's threshold assertion that he did not receive the process due him under *Hewitt.*