William FULTZ, Plaintiff,

v.

Richard WHITTAKER,
et al., Defendants.

Civ.A. No. 3:98CV–374–H.

United States District Court,
W.D. Kentucky,
at Louisville.

May 8, 2001.

Phillip Prather, Louisville, KY, William P. Emrick, Ashland, KY, David Russell Marshall, Nicholasville, KY, for plaintiff.

Sun S. Choy, Morgan & Pottinger, R. Thadeus Keal, Thompson & Miller, Dave Whalin, Robert T. Watson, Landrum & Shouse, Louisville, KY, for defendants.

## MEMORANDUM OPINION

HEYBURN, Judge.

Defendants now move for summary judgment for failure to state a claim upon which relief can be granted for qualified immunity. Plaintiff, William Fultz, is paralyzed from the neck down due to a broken neck sustained during an arrest by Oldham County police officers Richard Whittaker and Kevin Nuss ("Defendant Officers"). Plaintiff's complaint under 42 U.S.C. § 1983 alleged that Defendant Officers violated the Fourth, Fourteenth, and Eighth Amendments to the United States Constitution and that the defendant gov-

ernment agencies and supervising officials violated his constitutional rights through certain municipal customs or policies. Plaintiff also alleges certain state law causes of action.

Due to the terrible injury, the uncertainty about what caused it, and the sharp differences among witnesses about significant aspects of the officers' conduct, the pending motions present particularly difficult questions. The parties have agreed that some of the pending claims should not be considered at this time.

### I.

Because the legal issues on summary judgment turn on subtle and hotly contested facts a detailed discussion of the record is appropriate.

Officers Nuss and Whittaker responded to a report of a domestic disturbance at 1805 Button Lane in Oldham County, Kentucky. They arrived in two separate police cruisers and entered the Fultz's property. Whittaker questioned Woodford and Granville Fultz (Plaintiff's uncle and father respectively) about the domestic violence report while Nuss remained by his car. During the questioning, Plaintiff, evidently both intoxicated and agitated, approached the officers in a manner they perceived as belligerent and verbally abusive. Nuss Dep. at 69. Plaintiff came very close to Nuss, within inches of his face, telling him to leave their property. *Id.* Nuss told Plaintiff to back up.[1] Plaintiff backed away a bit, but not far enough to satisfy Nuss. *Id.* at 71; Whittaker Dep. at 125. Plaintiff's hands were in his back pockets. Nuss asked Plaintiff to show his hands. After stalling for a few moments, Plaintiff

removed his hands from his pockets. As Plaintiff moved his hands, Whittaker claims he saw Plaintiff move his hand "in a striking motion toward Officer Nuss." Whittaker Dep. at 126. Woodford Fultz did not perceive this as an attempt by Plaintiff to harm the officers. Woodford Fultz Dep. at 3. Whittaker did perceive imminent harm to Nuss. He grabbed Plaintiff's arm, told Plaintiff he was under arrest, and attempted to handcuff him.[2] Whittaker Dep. at 125–26; Nuss Dep. at 72. Nuss also grabbed Plaintiff's arm. The two officers placed him on the hood of one of the police cruisers to handcuff him.

Plaintiff responded by locking his hands together in front of his chest. The two officers were unable to place his hands behind his back. Whittaker sprayed Plaintiff's face with O.C. spray (a type of pepper spray) but the spray seemed to have no effect. Whittaker Dep. at 126. The officers continued struggling with Plaintiff, eventually rolling around on the grass. After "scuffling" with the officers on the grass for several minutes Plaintiff finally gave up. The officers handcuffed his hands behind his back.

Five eyewitnesses observed some of the events from the time Plaintiff was handcuffed to the time of the injury: two neighbors Cheryl Willbanks–Gore ("Gore") and Daryl Jenkins; Woodford Fultz, and the two officers. On a few key issues, the officers' version of the facts differs from that of the other eyewitnesses. Specifically the witnesses disagree about the type of hold Whittaker used on Plaintiff and about whether Whittaker acted deliberately to break Plaintiff's neck.

---

**1.** Woodford Fultz, Plaintiff's uncle, was standing nearby. He confirms that Plaintiff was close to the officers, "up in their face", and that the officers said, "back up." Woodford Fultz Dep. at 3. Though it is not important for

this analysis, he did not believe Plaintiff intended to hurt the officers. *Id.*

**2.** Although Plaintiff was told he was under arrest, no specific charges were identified at this time.

According to the officers, after handcuffing Plaintiff, they pulled him up and walked him to a police cruiser. Nuss walked in front of Plaintiff and Whittaker walked behind. Just as Nuss opened the rear door of the cruiser door, Plaintiff kicked him in the inner upper thigh. Nuss Dep. at 103. Immediately, Whittaker grabbed Plaintiff in what he described as a "bear hug" and pulled him back away from Nuss. Whittaker Dep. at 129–30. As he pulled Plaintiff, their legs became tangled; they both fell to the ground, and Plaintiff's neck was broken in the fall. *Id.* at 129. Whittaker adamantly insists that he did not have his hands' around Plaintiff's neck at any time, *id.* at 186; that he never used a "choke hold," *id.* at 180, 186; but instead had him in a "bear hug", *id.* at 129, 174, 186; or "around the biceps." *id* at 173. Nuss confirms that Whittaker grabbed Plaintiff around the "chest area" after Plaintiff kicked his inner thigh. Nuss Dep. at 105. Photographs of Nuss' uniform confirm a footprint on this part of his pants. *Id.* at 104. Nuss does not recall exactly how the fall occurred because he was bent over checking himself. *Id.* at 105–06.

Gore, Jenkins, and Woodford Fultz present a different picture. Gore was sitting at a picnic table across the street. The police cruiser obstructed her view of Plaintiff's legs. Gore Dep. at 66. Initially, she claimed not to have seen anything but later came forward because she wanted to tell the truth, *id.* at 13, and she felt that the police officers had wronged Plaintiff. *Id.* at 18. Prior to this incident she had been introduced to Plaintiff just once. *Id.* at 44–45. She arrived at the scene as the officers and Plaintiff were "scuffling." *Id.* at 51. She states several times that as the car door was being opened, *id* at 75, Whittaker was holding Plaintiff by the neck, *id.* at 52, 65, 66, 75, 78, his right forearm up under Plaintiff's chin, *id.* at 67. She saw Plaintiff "kick at the [car] door", *id.* at 66,

74, 75, and saw Officer Nuss lean forward *id.* at 72. Then Whittaker "snapped," *id.* at 52, 71, 79, or pulled back on Plaintiff's neck, Gore exclaimed, "they just snapped his neck", *id.*, and both men fell to the ground.

Gore insists that she saw Whittaker "snap" Plaintiff's neck out of anger, indicating that she saw a deliberate act: "And then I seen one of the officers just get frustrated—just angry, you know, 'I'm tired of this,' and just snapped his—snapped his neck, and then they went to the ground." *Id.* at 52; "And it was like the bigger officer had just gotten mad and snapped his neck, they fell to the ground and that was it."; *id.* at 67; Question (By Defendants' Attorney), "Now why do you—I mean, what did you see that you made you think that the officer had gotten mad?" Answer, "Well they had—like I said, they had scuffled to begin with—they were on the ground and you can just—I mean, you could—I could see it in his face that he was just, you know-you know, he was tired of William, I guess, apparently struggling with him. He was tired of having to … the look on his face was like he was tired of William's attitude." *Id.* at 74.

Gore bases her belief that she saw Whittaker deliberately break Plaintiff's neck on comparisons with television shows, particularly shows portraying martial arts, in which one character breaks another's neck. *Id.* at 72–74. She said in these shows one can recognize an act purposefully aimed at breaking someone's neck: "… you just grab them around their neck and you twist like that [indicates a physical action] and they can snap it-or it pops or …" *Id.* at 74. Her belief that Whittaker was acting in anger is based on Whittaker's facial expressions. She said, "I could see it in his face", *id.* at 74, and "I could see the anger in his face", *id.* at 78.

Gore's husband, Daryl Lee Jenkins had just returned from the grocery store when the officers arrived at the scene. He was sitting across the one lane gravel road from the police cars with nothing obstructing his view of the scuffle. *Id.* at 43. Jenkins had little interaction with Plaintiff. Jenkins Dep. at 16.

Jenkins said several times that as Plaintiff was being placed in the police car one of the officers had his arm around Plaintiff's neck with his other hand behind his back, *id* at 46, 48, 49, 60, 72. He said explicitly that the officer did not have Plaintiff in a bear hug, but around the neck. *Id.* at 48. He saw Plaintiff kick at what he believed was the car door, *id.* at 46, although he also acknowledged that from his viewpoint he couldn't really tell where he was kicking. *Id.* at 47. When Plaintiff's attorney asked him, "Did you see the officer who had him restrained in the choke hold deliberately wrench his neck?" he responded, "Yes, sir." *Id.* at 62. He said the jerk and the fall looked like separate acts, *id.* at 62, and that Whittaker's facial expression led him to believe Whittaker was acting in anger, *id.* at 67, 68, 73. However, he also said Whittaker may have jerked Plaintiff's neck in an attempt to protect Nuss from being kicked, *id.* at 73 and acknowledged that he couldn't tell whether the jerk of the neck and the fall were two separate acts or one continuous act. *Id.* at 71. He also confirmed that at the moment Whittaker jerked back on Plaintiff's neck Gore exclaimed, "they just broke his neck." *id.* at 62.

Plaintiff's uncle, Woodford Fultz, was on the scene from the moment the police arrived. He watched the scuffle looking at the backs of Plaintiff and Whittaker after the officers handcuffed Plaintiff and were approaching the car. Woodford Fultz Dep. at 49. He saw them approach the car with Whittaker's arm around Plaintiff

pulling his neck back. *Id.* at 5. He saw Plaintiff kick at something, "I don't know if he kicked at the officer or the door." *Id.* at 5. And then he saw them go down to the ground. *Id.* at 5. Woodford Fultz states specifically that Whittaker's hold was not a "bear hug", *id.* at 6, 14, 15, and that, "he just had that one arm right around his neck." *Id.* at 6, 40. Woodford Fultz does not say that the officers intentionally harmed Plaintiff. *Id.* at 40,42. However, later he says he cannot really say what happened, if his neck broke in the fall or just when it broke, *id.* at 42, "It could have been an accident and it might not have been, I don't know." *id.* at 49.

Plaintiff himself does not remember anything from the point when he was sprayed with O.C. spray to when he was lying on the grass and realized his neck was broken.

There are expert opinions in the record. However, the parties have agreed that expert testimony would not be considered at this stage. Later on, that testimony could help resolve certain issues in the case.

## II.

In order to prevail on a claim pursuant to 42 U.S.C. § 1983, a plaintiff must establish that the defendant deprived him of a right secured by the Constitution or laws of the United States, and that the defendant acted under color of law. *Flagg Bros. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). Under the doctrine of qualified immunity as defined by *Harlow v. Fitzgerald,* "government officials performing discretionary functions, generally are shielded from liability for civil damages [under § 1983] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted).

The central purpose underlying qualified immunity is to protect public officials from "undue interference with their duties and from potentially disabling threats of liability." *Elder v. Holloway*, 510 U.S. 510, 514, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) (quoting *Harlow*, 457 U.S. at 806, 102 S.Ct. 2727). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," it is important to resolve it at the earliest possible stage in litigation. *Black v. Parke*, 4 F.3d 442, 445 (6th Cir.1993) (citing *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).

■ Whether to grant qualified immunity is normally a question of law for the court but when this question turns upon which version of contested facts one accepts, "the jury, not the judge, must determine liability." *Fisher v. Memphis*, 234 F.3d 312, 317 (6th Cir.2000) (citing *Sova v. Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998)); *Black*, 4 F.3d at 445. When the issue of qualified immunity arises on summary judgment, the Court must draw all reasonable inferences of the factual evidence in favor of the non-moving party. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir.1999). However, in order to prevail, "the non-movant must show sufficient evidence to create a genuine issue of material fact." *Id.* A "mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* (citations omitted).

■ The Sixth Circuit has adopted a three part test to determine whether qualified immunity should be granted: first, a constitutional violation must have occurred; second, the right that was violated must be clearly established such that a reasonable person would be aware of it; finally, the plaintiff must allege sufficient facts, supported by sufficient evidence, to indicate that what the official did was objectively unreasonable in light of the clear-

ly established constitutional rights. *Id.* at 691 (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1157–58 (6th Cir.1996)).

Here, Plaintiff claims he was deprived of a constitutional right by: (1) arrest without probable cause; (2) Whittaker's use of pepper spray; (3) being held by Whittaker in a choke-hold or a head-lock in a manner that constitutes an unreasonable use of force; (4) Whittaker deliberately wrenching, twisting, or jerking his neck in a manner purposefully calculated to cause serious bodily harm; and (5) being denied adequate medical care by being left on the ground for forty-five minutes before an ambulance arrived. The Court must consider qualified immunity as to each.

### III.

■ Plaintiffs' first claim is that Defendants Whittaker and Nuss arrested him without probable cause. Arrest without probable cause does violate the Fourth Amendment. *Donovan v. Thames*, 105 F.3d 291, 297–98 (6th Cir.1997) (citing *Beck v. Ohio*, 379 U.S. 89, 90–91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). Whether probable cause to arrest exists depends on the knowledge of the arresting officers. *Smith v. Thornburg*, 136 F.3d 1070, 1077 (6th Cir.1998). Here, Whittaker and Nuss claim they had probable cause to arrest Plaintiff for the crime of menacing. The officers' claim of qualified immunity will fail only if a reasonable and prudent officer would not believe he or she had probable cause to arrest Plaintiff for Menacing. *See Donovan*, 105 F.3d at 298.

■ KRS 508.050 provides that "A person is guilty of menacing when he intentionally places another person in reasonable apprehension of imminent physical injury." Both officers and Woodford Fultz state that Plaintiff Fultz came very close to the officers. The officers say Plaintiff had an aggressive posture and was yelling. No other testimony disputes

this. Whittaker says he saw Plaintiff try to swing at Nuss. Another interpretation could view Plaintiff as responding to the Defendant officers' request to bring his hands into full view. Based upon the circumstances and Plaintiff's physical movements, Whittaker's belief that Plaintiff was threatening Nuss was reasonable, even if it might have been mistaken. This threatening posture could have led either officer to believe Plaintiff would soon try to injure them.

Drawing all reasonable inferences in favor of the Plaintiff, this Court finds that a reasonable and prudent officer would have probable cause to arrest Plaintiff for menacing. Therefore, the officers are entitled to qualified immunity as to that claim.

### IV.

Plaintiff next claims a violation of his Fourth Amendment right to be free of excessive force. He alleges that Whittaker used excessive force in three ways: spraying him with O.C. spray; using an unreasonably dangerous choke-hold or neck hold; and deliberately wrenching or twisting his neck. As to each claim, the Court must decide whether: (1) Plaintiff has alleged violation of a constitutional right; (2) the right is clearly established; and (3) Plaintiff supported this claim with sufficient evidence to indicate the officer's action was objectively unreasonable.

### A.

No one disputes that in trying to handcuff Plaintiff one of Whittaker's first moves was to spray Plaintiff with O.C. spray. As recently as 1997 the Sixth Circuit found that the use of pepper spray by a police officer attempting to take someone into custody is reasonable. *Monday v. Oullette*, 118 F.3d 1099, 1104–05 (6th Cir. 1997) ("The decision by [the officer to use pepper spray] rather than risk injury and further delay through a physical confrontation with a large and intoxicated person did not constitute excessive force.").

■ Our case is somewhat similar. No one disputes that Plaintiff was belligerent, ignored reasonable requests and, at the least, passively resisted arrest prior to the use of the O.C. spray. Plaintiff presents no actual evidence that the O.C. spray caused anything other than its intended temporary discomfort and disorientation. Some might say that the use of O.C. spray this early in the confrontation was unnecessary. However, in these circumstances, a reasonable police officer could believe that Officer Whittaker's decision to use O.C. spray was proper and certainly was not excessive force. Therefore, Whittaker is entitled to qualified immunity on this claim as well.

### B.

The Court considers next whether Plaintiff states a constitutional claim as a result of Whittaker holding Plaintiff by the neck. To be sure, both officers claim that at the moment Plaintiff, in handcuffs, kicked Officer Nuss, Whittaker grabbed Plaintiff around the chest in a "Bear Hug." However, three eyewitnesses said unequivocally that Whittaker was holding Plaintiff around the neck.[3] For purposes of sum-

---

**3.** Although these witnesses are clear in describing Whittaker's hold on Plaintiff as some sort of hold with Whittaker's arm around Plaintiff's neck, they do not describe the precise nature of this hold. During oral argument, Defendants' counsel pointed out that "choke hold" is a term of art among police describing a particular type of hold designed to render someone unconscious by blocking the flow of blood to the head. These lay witnesses do not have the expertise to recognize such a hold or the vocabulary to describe it. However, for the purposes of the present motion it is not necessary to determine the precise nature of Whittaker's hold. Any hold that creates an unreasonable risk of injury to the spinal chord could lead to excessive force,

mary judgment and qualified immunity, the Court must assume that the officers had some kind of hold around Plaintiff's neck. *See Fisher,* 234 F.3d at 317.

■■■ Whether Whittaker deprived Plaintiff of a constitutional right in holding him by the neck depends on the degree to which this hold creates a danger of serious injury. On this issue both the law and the facts are uncertain. Under the Fourth Amendment, a "seizure" is constitutional only to the extent that it is reasonable. *Tennessee v. Garner,* 471 U.S. 1, 6, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Determining whether a particular use of force is reasonable requires careful analysis of the facts and circumstances of each particular case. *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In the context of the Fourteenth Amendment[4], the Supreme Court recognizes that the culpability of a police officer trying to effect an arrest falls along a spectrum. *Sacramento v. Lewis,* 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). "Negligently inflicted harm is categorically beneath the threshold of Constitutional due process." *Id.* (citations omitted). At the other end of the spectrum is conduct intended to injure someone in a manner not justified by any government interest. *Id.* Prior to *Lewis,* the Sixth Circuit drew the line at deliberate indifference. *Stemler v. City of Florence,* 126 F.3d 856, 870 (6th Cir.1997) ("... where the plaintiff suffered injury as a result of being placed in the state's custody, it has consistently and uncontroversially been

the rule that a constitutional claim arises where the injury occurred as a result of the state's deliberate indifference to the risk of such an injury."). *Lewis* modified this rule distinguishing emergency situations in which an officer must make a decisive and quick decision. In such situations, an officer has no time for deliberation and is therefore held to the higher "shocks the conscience" standard. *Lewis,* 523 U.S. at 851, 118 S.Ct. 1708.

The Court discussed these issues at some length with the parties. The parties focused their discussion on two possible causes of the injuries. Plaintiff's emphasized that Whittaker intentionally used force to cause serious injury. Defendants said that the injuries were an accidental result of the fall. Neither gave adequate consideration to the middle ground: that Plaintiff's injury resulted from a combination of the dangerous choke-hold, the handcuffs, and the dynamics of the fall. Whether Whittaker's hold, in these circumstances, subjected Plaintiff to such a great risk of serious bodily harm that no reasonable officer would believe such a hold was lawful is a close question.

■■■ That it may not have been good police procedure to hold a handcuffed prisoner around the neck is not a constitutional violation. Plaintiff did demonstrated a threat to Defendant officers and had resisted arrest. Further Plaintiff has no evidence that Whittaker used force which caused harm, pain or other physical injury during the brief walk after the scuffle to

---

whether it is a technical choke hold or a simple head lock.

**4.** Both the Supreme Court and the Sixth Circuit have indicated that the different standards of care imposed by the Fourth, Eighth, and Fourteenth Amendments are not categorically distinct. *Lewis,* a Fourteenth Amendment case drew upon *Graham v. Connor,* a Fourth Amendment Seizure, and *Rochin v.*

*California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), a Fourth Amendment Search. The Sixth Circuit based its "deliberate indifference" rule in *Stemler v. City of Florence,* 126 F.3d 856, 870 (6th Cir.1997), on a series of cases involving the Eighth Amendment finding them applicable under the general category of duties owed to "persons in the custody of the state." *See id.*

the police car. The significant evidentiary fact is that prior to Plaintiff's kick Whittaker never applied the choke-hold in a manner which caused injury. Using an unauthorized hold or procedure, where the force itself is not excessive, does not create a constitutional violation.[5]

■ However, a hold that subjects someone to serious risk of great bodily harm could be a constitutional violation. The danger to which Whittaker may have subjected Plaintiff in holding Plaintiff around the neck is a material fact which is, as yet, undeveloped but is ripe for expert opinion.[6] Should the expert testimony reveal evidence that Whittaker's hold created the risk of serious bodily injury, a jury could conclude no reasonable officer would use such a hold and that the injuries sustained here were a reasonably foreseeable consequence of the hold. Because the parties have not finished expert disclosures, the Court believes that it has insufficient information to rule on the question of qualified immunity as to this second possibility. Summary judgment at this stage is inappropriate. The Court will consider subsequent motions on this issue upon the close of discovery.

### C.

■ Plaintiff's third allegation of excessive force is that Whittaker wrenched or twisted Plaintiff's neck in a move either purposefully designed to cause serious injury or which he knew was likely to cause serious injury. No reasonable police officer could believe the law permits a police officer to purposefully wrench someone's neck in this manner, even under these circumstances. It is clearly established that force intended to cause serious injury or death is unconstitutional unless necessary to apprehend a fleeing felon or the suspect poses a threat to the safety of the officers or a danger to the community. *See Garner*, 471 U.S. at 6, 105 S.Ct. 1694. Even if Plaintiff is deemed to have kicked Nuss in the groin, the handcuffs prevented him from posing any credible threat to the officers or others. Nuss had many options other than deadly force.

The more difficult issue is whether Plaintiff has supported this allegation with sufficient evidence to allow a reasonable jury to believe Whittaker acted to purposefully break Plaintiff's neck. The testimony of two possibly disinterested witnesses gives some support to Plaintiff's allegation that Whittaker intended to cause serious injury. The testimony and the interpretation of it, is hotly disputed. Without a more precise description of Whittaker's actions, Gore's statements to the effect that she saw Whittaker deliberately break Plaintiff's neck are at best interpretations of what she perceived. These perceptions could be an honest but mistaken interpretation but they could also be correct. As a matter of perception, there is only a subtle difference between Plaintiff's neck inadvertently breaking as a consequence of falling while in Whittaker's grasp, and Whittaker intentionally breaking Plaintiff's neck just prior to falling or in the course of the fall. Gore could not perceive Whittaker's intentions. However, witnesses commonly infer the motive and character underlying certain physical acts by watching an actor perform the act.

---

**5.** Similarly, § 1983 does not reach claims based on negligence-even when such negligence is gross. *See Lewellen v. Metropolitan Government*, 34 F.3d 345, 351 (6th Cir.1994); *Collins v. Harker Heights*, 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).

**6.** Officer Nuss's statements that a choke hold presents "very, very serious deadly force issues" and that a choke hold should never be used on a person in handcuffs, Nuss Dep. At 115 16, do provide evidence supporting Plaintiff's position but they are not, by themselves, conclusive.

This is the sort of act that is so subtle that the true character of the act could only be inferred by one watching it and rendering an immediate judgement based on the totality of what was perceived.

Gore's exclamation, "they just broke his neck" pronounced before the men fell to the ground and before Plaintiff himself said "my neck's broke" adds credibility to her assessment. The fact that she may have this pronouncement before the men fell suggests that Whittaker's breaking of the neck could have been a distinct act that was separate from the fall. This also suggests that her interpretation was not manufactured after the fact out of sympathy for Plaintiff's suffering but was an immediate assessment of what she had seen. Jenkin's confirmation of her excited utterance adds further weight to Gore's credibility.

Some of Jenkins' testimony also generally supports the theory that Whittaker deliberately broke Plaintiff's neck. Responding to a question by Plaintiff's attorney he affirmed this theory. Based on Whittaker's facial expressions he concluded Whittaker was acting in anger. However, Jenkins's description of the event is less precise than Gore's and he is less resolute in his belief that the twisting of the neck is a separate and deliberate act acknowledging, upon questioning by the Defendants' attorney, that it was possible that Plaintiff's neck was broken during the fall as a single act.

The other testimony is inconclusive. Woodford Fultz's testimony on this issue offers little help. He believes that it was an accident but also says he's not sure what happened. At this stage, the experts' testimony on this issue is also inconclusive.

Taking all this evidence together and drawing all reasonable inferences in favor of the non-moving party, some evidence does seem to support the proposition that Whittaker deliberately used force which he knew could cause serious injury or break Plaintiff's neck. To be sure, this is an extraordinary claim. No apparent motive, except sudden anger and frustration, suggests that Whittaker would take such action. However, it is not the Court's role in deciding a motion for summary judgment to evaluate the credibility of witness testimony. It is possible that, in a moment of anger or frustration, a police officer, pumped with adrenaline from wrestling with a suspect and seeing his partner kicked near the groin, would deliberately use excessive force, which broke a suspect's neck. More important, some eyewitness testimony supports this conclusion. While the witnesses could be mistaken and their perceptions discounted, their claim does not appear to be so lacking in support, so motivated by prejudice, or so incompetent that a reasonable jury could not believe them. One could not say that a jury would be unreasonable in believing Ms. Willbanks–Gore and Mr. Jenkins and disbelieving the officers.[7] Therefore, this Court concludes that Plaintiff has supported this allegation with sufficient evidence. Consequently, the Court must deny qualified immunity on this claim.

## V.

Plaintiff's final § 1983 claim against the Defendant Officers is that they deprived him of a constitutional right by deliberate indifference to his need for emergency medical treatment. Plaintiff argues that it took forty-five minutes for the ambulance to arrive and that this constitutes deliberate indifference to Plain-

---

7. It is axiomatic that a jury cannot regard a police officer's testimony as more or less credibly solely by virtue of their status as police officers.

tiff's medical needs. In *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court held that the Eighth Amendment is violated when prison officials are deliberately indifferent to the serious medical needs of prisoners. *See also Hicks v. Frey*, 992 F.2d 1450, 1454–55 (6th Cir.1993). An official acts with deliberate indifference to a suspect's medical needs when the official knows of and disregards an excessive risk to a suspect's safety or health. *Sanderfer v. Nichols*, 62 F.3d 151, 155 (6th Cir.1995).

■■■ Here, the officers do not appear to have done anything unreasonable in calling for emergency medical assistance. Plaintiff's sole evidence in support of his theory that there was undue delay in summoning medical assistance is the testimony of two witnesses, Woodford Fultz who said it took the officers "fifteen or twenty minutes" to radio for help, Woodford Fultz Dep. at 50, and Daryl Lee Jenkins who said Plaintiff was on the ground about forty-five minutes before leaving in an ambulance. Jenkins Dep. at 50. Both of these are subjective recollections, neither witness checked their watches to mark the time. Their observations are entirely inconsistent with some existing objective facts. Oldham County Emergency Dispatch records show that the officers arrived at the Fultz residence at 3:41 p.m. and that they called for emergency medical services six minutes later at

3:47. It is difficult to measure time accurately by subjective recollection, especially when recalling a time of crisis. The run sheets are kept by people with a duty to keep accurate records and these records reflect a prompt response to Plaintiff's needs.[8] On these facts no reasonable jury could believe these officers acted with deliberate indifference to Plaintiff's medical needs. Qualified immunity on this claim is appropriate.

## VI.

Plaintiff's § 1983 claims against several county-level government agencies and officials allege that these defendants violated Plaintiffs' Constitutional rights by failing to adequately train Defendants Whittaker and Nuss on the use of force in effecting an arrest. These defendants are the Oldham County Police Merit Board[9] ("Merit Board"); Oldham County, Kentucky ("County"); the Oldham County Fiscal Court[10] ( "OCFC"); Oldham County Judge Executive John Black; the Oldham County Police Department ("OCPD"); and Oldham County Police Chief Gene Hicks. The parties agreed not to submit argument as to Plaintiff's federal constitutional claim of inadequate training on the part of Oldham Count Fiscal Court. Therefore, the Court has not considered qualified immunity as to that issue. However, the Court can decide some threshold issues.

---

**8.** Plaintiff claims he is being denied access to audio tapes that could prove his allegation that there was an undue delay in summoning medical assistance. The proper recourse for this claim is to file a motion to compel Defendants to produce these tapes. If, after reviewing these tapes, Plaintiff discovers relevant evidence supporting his claim, and if this evidence was wrongfully withheld at the time Plaintiff filed his response, Plaintiff may file a Motion to Reconsider which this Court will carefully review.

**9.** The Merit Board members named in the complaint are:

Tim Scott
Mary Glenn McMurray
Jerome Hartley
Edmond Weatherby

**10.** OCFC members named in the complaint are:

Donald Adams
Norman Brown
Bob Deibel
Paula Gish
Rick Rash
Bill Tucker
Gilbert Winters
James Shaw

■ Maintaining an action against both OCFC and all the other county-level government agencies and officials is redundant. Since OCFC is the real party in interest the claims against the Merit Board, the County, John Black (in his official capacity), the Police Department, and Gene Hicks (in his official capacity) can be dismissed.[11] A section 1983 claimant suing a municipality must name as a defendant a municipal entity that is capable of being sued. Under the Federal Rules of Civil Procedure whether an entity may sue or be sued is determined by the law of the state in which the district court is held. Fed.R.Civ.P. 17(b); *Darby v. Pasadena Police Dept.*, 939 F.2d 311, 313 (5th Cir. 1991).

Under Kentucky law the Merit Board and the OCPD are creations of the OCFC and have no legal existence separate and apart from the OCFC. Likewise, Oldham County itself can only be sued through the OCFC. In Kentucky "fiscal courts" are local legislative bodies that govern counties. Ky.Rev.Stat. Ann. ("KRS") § 65.410(1) (2000); KRS § 67B.020 (2) (2000); *C & H Entertainment, Inc. v. Jefferson County Fiscal Court*, 169 F.3d 1023, 1024 (6th Cir.1999). Fiscal courts are vested with the ability to provide local governmental services, KRS 67.080, among which is the duty to provide for police protection. KRS 67.083(3)(u).

■ Similarly, a suit against an individual "in his official capacity" is essentially a suit brought directly against the local government unit. *Leach v. Shelby County Sheriff* 891 F.2d 1241, 1245 (6th Cir.1989). In contrast to personal capacity suits, offi-

cial capacity suits, "represent only another way of pleading an action against an entity of which an officer is an agent . . . [i]t is not a suit against the official personally, for the real party in interest is the entity" *Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Since the Fiscal Court is liable for the official actions of its senior policy-making officials,[12] dismissing the suit against John Black and Gene Hicks in their official capacities makes no practical difference. *Jungels v. Pierce*, 825 F.2d 1127, 1129 (7th Cir.1987) (Posner, J.,). However, Plaintiffs' actions against the individual defendants in their official capacities do duplicate the action against the Fiscal Court and for the sake of accuracy Defendants John Black and Gene Hicks should be dismissed to the extent they are sued only in their official capacity.

■ A county cannot be held liable for its own unconstitutional or illegal policies alone. *Monell v. Dept. of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Brown v. Shaner*, 172 F.3d 927, 930 (6th Cir.1999). "The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the· rights of persons which whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Brown*, 172 F.3d at 930. As an example of when a failure to train could amount to deliberate indifference the Court noted that since city officials know to a moral certainty that police officers will arrest fleeing felons, and since the city has armed

11. Plaintiff's complaint does not actually specify whether John Black and Gene Hicks are sued in their official or personal capacities. However, Plaintiff has not alleged any fact or made any argument that suggests these he is bringing any claim against Black or Hicks in their personal capacities. There-

fore it is assumed that they are sued only in their official capacities.

12. This Memorandum Opinion expresses no opinion as to whether any of the named individual defendants are senior policy-making officials.

its officers with firearms to use in making such arrests, a failure to train officers on the constitutional limits of the use of deadly force could be characterized as deliberate indifference to constitutional rights. *City of Canton,* 489 U.S. at 390 n.10, 109 S.Ct. 1197. In that case the Supreme Court inferred deliberate indifference because the need for such training is obvious in light of the constitutional violations likely to occur in its absence. *Id.* at 390, 109 S.Ct. 1197.

Any deficiency in training must be closely related to the ultimate injury and must have actually caused the injury. *Id.* at 391, 109 S.Ct. 1197. The "deliberate indifference" standard allows for the fact that adequately trained officers occasionally make mistakes. *Id.* Such random mistakes by otherwise well trained officers say little about a training program and do not provide a legal basis for holding the city liable. *Id.* An unconstitutional policy can also be shown by improper supervision. To succeed a plaintiff must show not only that the supervisor was negligent in tolerating an unconstitutional practice but also that the supervisor encouraged the specific incident of misconduct or directly participated in it. *Sova v. City of Mt. Pleasant,* 142 F.3d 898, 904 (6th Cir.1998) (quoting *Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 727 (6th Cir.1996)). However, neither a county nor its policy making officials can be held liable where there is no underlying constitutional deprivation. *Claybrook v. Birchwell,* 199 F.3d 350, 361 (6th Cir.2000) (quoting *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)) *(per curiam).*

Here, Plaintiffs claims against OCFC based on arrest without probable cause and excessive force by Whittaker in spraying him with O.C. spray should be dismissed since the underlying claims do not allege a constitutional violation. Similarly, Plaintiff's claim against OCFC based on Whittaker and Nuss' failure to promptly summon an ambulance can be dismissed since the Plaintiff has not alleged facts from which a reasonable jury could believe a constitutional violation occurred. Nor has Plaintiff alleged sufficient facts to show that Oldham county's supervisory personnel encouraged or participated in the incident that resulted in Plaintiff's injury. Therefore, Plaintiff's claims of improper supervision have no basis as applied to these underlying claims that have been dismissed.

The remainder of Plaintiff's inadequate training claim under § 1983 is not ready for this Court's review.[13]

### VII.

In addition to the § 1983 cause of action, Plaintiff also brings several state law claims, for assault and battery, outrage, and false arrest. Common law claims asserted against a police officer for actions taken in the course of an arrest naturally raise the issue of Kentucky's law of sovereign immunity. This issue has not yet been briefed by the parties. In *Franklin County v. Malone,* 957 S.W.2d 195, 202 (Ky.1997), the Supreme Court of Kentucky held that police officers acting within the scope of their authority are entitled to claim sovereign immunity and the only recourse available is through Kentucky's Board of Claims. *Franklin County* considered a claim for negligence. Whether Kentucky's law of sovereign immunity also covers intentional torts is uncertain. The parties should have had an opportunity to brief this issue before the Court decides

---

**13.** The Court does note that to the extent Plaintiff argues that Defendant Officers intentionally used excess force, this would diminish the potential for an inadequate training claim.

whether these state law claims should be dismissed.

The Court will enter an order consistent with this Memorandum Opinion.

## ORDER

Defendants have moved for summary judgment on a variety of grounds, including qualified immunity. In summary, Plaintiff's claims against Defendant Officers Whittaker and Nuss based on arrest without probable cause, excessive force by the use of pepper spray, and deliberate indifference to Plaintiff's medical needs are dismissed. Plaintiff's claims against the Defendant government agencies and supervising officials are dismissed, except as to Defendant Oldham County Fiscal Court ("OCFC"). Only those claims that survive against the individual officers may serve as a basis for liability by the OCFC. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants' motion for qualified immunity is SUSTAINED IN PART. All Plaintiff's federal claims are DISMISSED WITH PREJUDICE, except Plaintiff's claim that the use of the choke-hold or the use of other excessive force caused his broken neck.

IT IS FURTHER ORDERED that the complaint as to Defendants John Black, Gene Hicks, Tim Scott, Mary Glenn McMurray, Jerome Hartley, Edmond Weatherby, Donald Adams, Norman Brown, Bob Deibel, Paula Gish, Rich Rash, Bill Tucker, Gilbert Winters, James Shaw and the Oldham County Police Department is DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Plaintiff's complaint as to Oldham County Fiscal Court is DISMISSED WITH PREJUDICE, except as to the federal constitutional claims of inadequate training regarding the use of neck holds or inadequate training in the use of force in making an arrest.