**William FULTZ, Plaintiff,**

v.

**Richard WHITTAKER,
et al., Defendants.**

**Civil Action No. 3:98CV–374–H.**

United States District Court,
W.D. Kentucky,
At Louisville.

April 2, 2003.

William P. Emrick, McKenzie, Woolery & Emrick, Ashland, KY, Phillip Prather, Louisville, KY, David Russell Marshall, Nicholasville, KY, for Plaintiff.

Dave Whalin, Robert T. Watson, Landrum & Shouse, Louisville, KY, R. Thaddeus Keal, Thompson, Miller & Simpson, Louisville, KY, Sun S. Choy, Freeman, Mathis & Gray, LLP, Atlanta, GA, for Defendants.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

Defendants, Officer Richard Whittaker, Officer Kevin Nuss and the Oldham County Fiscal Court ("Oldham County") have moved for summary judgment on all Plaintiff, William Fultz's, remaining claims.[1] Early on in the case, Defendants moved for summary judgment on qualified immunity grounds. The Court partially granted Defendants' motion.[2] *See Fultz v. Whittaker,* 187 F.Supp.2d 695 (W.D.Ky.2001). Substantial discovery has occurred since then. Defendants argue that this evidence establishes that the Officers are entitled to qualified immunity on each of Plaintiff's remaining claims. Defendants also urge the Court to grant them judgment as a matter of law on Plaintiffs' state law claims and his claims against Oldham County.

The Court has extensively reviewed the expert opinions and testimony submitted by the parties. The Court had hoped such

---

1. In conjunction with their summary judgment motion Defendants have also moved to exclude the testimony of various expert and lay witnesses. The Court will not separately address each motion to exclude at this juncture. Where the Court relies on a particular item of evidence in the body of this Opinion, it will explain its reasoning for concluding that the evidence relied on is admissible. Otherwise, Defendants may presume that the Court did not rely on any evidence of questionable admissibility. Of course, Defendants are free to renew their motions should this matter reach trial.

2. The Court, denied Defendants' motion with respect to Plaintiff's claim of excessive force that Whittaker wrenched, twisted or jerked Plaintiff's neck in a manner purposefully calculated to cause serious bodily injury. *See id.* at 702–706. The Court reserved judgment on whether the Defendant Officers were entitled to qualified immunity on Plaintiff's claim that Whittaker used excessive force by holding Plaintiff in a neck hold that created a risk of serious bodily harm because the Court believed that expert testimony was necessary to properly decide that issue. The Court also reserved judgment on Plaintiff's state law claims against the two Officers and his claims against the Oldham County.

testimony might shed some valuable light on the cause of Plaintiff's injuries. While helpful, the expert evidence is far from conclusive. Key factual disputes remain about the Officers' conduct and the cause of Plaintiff's injury. Plaintiff has worked hard to produce evidence which supports several theories of excessive force. The Court finds it unlikely that a jury would find this testimony persuasive enough to return a verdict for Plaintiff. However, the Court cannot dismiss the case based on its own sense of the credibility or believability of witnesses it has not seen. This is a hard and close case. Nevertheless, disputes as to material facts foreclose both qualified immunity and summary judgment on certain constitutional claims at this time.

## I.

The facts giving rise to the instant dispute are fully set forth in the Court's prior Opinion and need not be summarized again. *See id.* at 698–701.

■ The medical experts disagree about the exact cause of Plaintiff's injury. Defendants' medical expert, Dr. Michael Lawrence, opined that Plaintiff's injury resulted from Plaintiff's head hitting the ground with Whittaker on top of him, not any type of twisting or wrenching motion. (Lawrence Aff. ¶ 8.) Another defense expert, Dr. William Smock, reviewed Plaintiff's medical records and found no evidence that Plaintiff had been subjected to a pressurized neck restraint. (Smock Dep. at 50–51.) Plaintiff's medical expert, Dr.

David Changaris, disagreed with Lawrence and Smock.[3] Dr. Changaris believes that Plaintiff's neck injury is consistent with a factual scenario in which a person is restrained from the back by a choke hold or neck restraint and the restraining party exerting a jerk or force to the neck area. (Changaris Report at 1.)

## II.

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter." *Wiley v. U.S.,* 20 F.3d 222, 227 (6th Cir.1994). The Court's role is limited to determining if the evidence submitted viewed in a light most favorable to the non-moving party presents a sufficient disagreement about the material facts so that submission to trier of fact is necessary, or whether the evidence is so one-sided that a party must prevail as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 251–52, 106 S.Ct. 2505.

■ The Sixth Circuit has adopted a three-part test to determine whether quali-

---

3. Defendants moved to exclude the testimony of Dr. Changaris as unreliable under *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This is weakest of all Defendants' exclusionary motions. Dr. Changaris is a board certified neurological surgeon. He has treated thousands of spinal cord injuries during his career. He extensively reviewed Plaintiff's medical records, and based his opinion on those records.

In all respects, Dr. Changaris appears imminently qualified to offer an expert opinion regarding the cause of Plaintiff's injury. Defendants are always free during cross examination to attack Dr. Changaris's credentials and the methods by which he arrived at his conclusions. The Court, however, has found absolutely no basis on which to exclude his medical opinion as to the cause of Plaintiff's injuries.

fied immunity should be granted: first, a constitutional violation must have occurred; second, the right that was violated must be clearly established such that a reasonable person would be aware of it; finally, the plaintiff must allege sufficient facts, supported by sufficient evidence, to indicate that what the official did was objectively unreasonable in light of clearly established constitutional rights. *See Williams v. Mehra,* 186 F.3d 685, 689–91 (6th Cir.1999) (*citing Dickerson v. McClellan,* 101 F.3d 1151, 1157–58 (6th Cir.1996)). Whether to grant qualified immunity is normally a question of law for the court, but when this question turns upon what version of contested facts one accepts, "the jury not the judge must determine liability." *Fisher v. Memphis,* 234 F.3d 312, 317 (6th Cir.2000) (*citing Sova v. Mt. Pleasant,* 142 F.3d 898, 903 (6th Cir.1998)).

### III.

The Court first addresses whether Plaintiff states a constitutional claim as a result of Whittaker holding Plaintiff by the neck prior to the instant Plaintiff kicked out in Nuss's direction.[4] This Court previously determined that this claim was not ripe for a qualified immunity determination because expert opinion testimony was necessary to establish the nature and degree of risk such a hold presented under the circumstances. *See Fultz,* 187 F.Supp.2d at 702–05. The parties have since supplemented the record with expert opinions. In light of this expert evidence, Defendants renew their motion for judgment as a matter of law on this portion of Plaintiff's excessive force claim.

### A.

▮ Under the first prong of the qualified immunity analysis, the Court must decide whether, viewed in the light most favorable to Plaintiff, the facts alleged show that Whittaker violated Plaintiff's right to be free from the use of excessive force during arrest. *Id.* at 701. In *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court held that claims alleging excessive force brought against law enforcement officials are to be analyzed under the objective reasonableness standard of the Fourth Amendment. "Ordinarily, in cases involving claims of excessive force during an arrest, courts determine reasonableness by considering the severity of the crime involved, the threat to the safety of the officers posed by the suspect, and any resistance to arrest." *Jackson v. Hoylman,* 933 F.2d 401, 402 (6th Cir.1991) (*citing Graham,* 490 U.S. at 396, 109 S.Ct. 1865). The "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *See Graham,* 490 U.S. at 397, 109 S.Ct. 1865. "The 'reasonableness' must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Id.* at 396, 109 S.Ct. 1865.

The expert evidence presented by the parties generally establishes that police officers are specifically trained in the use of neck restraints and that such restraints, under appropriate circumstances, represent entirely permissible and effective mechanisms to control subjects. Defendants' police tactics expert, Lieutenant William Weedman, has assisted in training police officers in the use of neck restraints throughout Kentucky. Lt. Weedman ex-

---

4. For purposes of summary judgment only Defendants concede that Whittaker was holding Plaintiff around the neck in some manner prior to the instant Plaintiff kicked out. The Officers continue to deny, however, that Whittaker applied any significant pressure to Plaintiff's neck.

plained that police officers are taught three different kinds of neck holds: Level 1, Level II, and Level III. (Lt. Weedman Dep. at 50–51.) Level I is the lowest type of hold and consists of simply placing an arm around the neck with no compression. *See id.* An officer would utilize such a hold to maintain control over a person to keep the person in one position. *See id.* Level II involves the application of some compression or force to the neck. *See id.* The force applied is generally enough to cause some discomfort and pain but generally not enough to produce unconsciousness. *See id.* An officer would use this type of force to control a resisting, but not necessarily highly dangerous subject. *See id.* Lt. Weedman stated that a Level II hold would not be considered deadly force.[5] *See id.* Level III is a wind choke that involves the application of force to the trachea. *See id.* The subject is brought under submission by unconsciousness. *Id.* The experts agree that this type of force is considered deadly and should only be used where there is a threat of serious physical injury to the arresting officers or third persons. *Id.*

 At the time of his arrest, Plaintiff was intoxicated and had previously acted in a manner the Officers perceived as both belligerent and threatening. He had resisted the Officers' attempts to cuff him which led to the use ·of pepper spray.

Plaintiff was eventually subdued and handcuffed after a scuffle with the Officers. At the time Whittaker allegedly first restrained Plaintiff by the neck, Plaintiff was not posing any immediate danger to the Officers or resisting arrest. By all accounts Plaintiff was just standing still in front of the police cruiser with the Officers. The only objectively reasonable purpose for the use of any type of restraint at this time would have been to maintain continued control over Plaintiff and assist in guiding Plaintiff into the police cruiser. Certainly, that need was present. The mere use of a neck restraint under these circumstances was not unconstitutional. While the evidence presented certainly tends to suggest that there were better police mechanisms available to Whittaker for controlling Plaintiff than the use of a neck restraint, the law does not require police officers to use the best technique in every circumstance. As the Court previously held, "using an unauthorized hold or procedure, where the force itself is not excessive, does not create a constitutional violation." *See Fultz,* 187 F.Supp.2d at 705. While a Level I neck hold may have been warranted, although not necessarily a preferable method of control in this case, it is certainly not clear that a Level II or Level III neck hold was appropriate given the circumstances. Plaintiff was not actively trying to flee or injure the Officers

5. Plaintiff's police tactics expert, Dr. Mayo, disagreed with this assessment. In Dr. Mayo's opinion, any force applied to the neck or head is potentially deadly. (Mayo Report at 4.) Defendants have moved to exclude Dr. Mayo's testimony on the ground that it is not relevant or reliable. The Court did not consider this testimony on summary judgment. In judging the reasonableness of Whittaker's actions the Court was concerned with the nature of information police officers generally receive about the use of neck restraints. While it may be true that some individuals like Dr. Mayo are theoretically opposed to the use of neck restraints in all situations, neither the case law nor the training Whittaker received would have led him to believe that an officer should never use a neck restraint, or that any force to the neck is deadly. The Court was most concerned with determining whether under these circumstances and based on the case law, a reasonable officer could have concluded that a neck restraint was warranted. Dr. Mayo's testimony was not particularly helpful in this regard. This is not to say that the Court will necessarily exclude Dr. Mayo should this matter go to trial. The Court will evaluate what, if anything, Dr. Mayo may testify to at trial, at the appropriate time.

at the time Whittaker allegedly first applied the neck hold. Even Defendants' own expert, Lt. Weedman, testified that under these circumstances force to the neck was not justified.

**B.**

 The final steps in the qualified immunity analysis require the Court to determine whether the right Whittaker allegedly violated was a "clearly established constitutional right of which a reasonable person would have known," and, if so whether Whittaker's actions were objectively unreasonable in light of the right. *See Dickerson,* 101 F.3d at 1158. For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo v. City of Cincinnati,* 953 F.2d 1036, 1042 (6th Cir.1992) (*quoting Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer,* 536 U.S. 730, 738–39, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002) (*internal citations omitted*). "Officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* Thus, the fact that there was no direct precedent from the Sixth Circuit or Supreme Court directly dealing with the constitutionality of neck restraints does not necessarily mean that the right to be free from certain

types of restraints under these circumstances was not clearly established for purposes of qualified immunity.[6]

The appropriate inquiry in this case is whether a reasonable officer could have objectively believed that using a neck restraint in which pressure or force is applied is an acceptable method by which to maintain control over a handcuffed individual not actively resisting arrest or physically threatening the Officers or others under these particular circumstances. Lt. Weedman explained that police officers are trained to use Level II holds only in situations where a person is "actively fighting or they are kicking or they are punching or they're elbowing or they may try to bite you or something like that, but there is clearly not a use of deadly physical force [by the subject]." (Lt. Weedman Dep. at 50–51.) According to Lt. Weedman, an officer would not use a Level II hold if the subject was "just stiffening up and not allowing themselves to be taken into custody." *Id.* Officers are instructed not to use Level III force unless the officer or a third person is confronted with the possibility of serious bodily injury. *Id.* When Plaintiff was standing with his hands cuffed behind his back after the initial struggle there would be no active level of threat. *See id.* The officer should just remain on alert for signs of an actual or perceived threat. *See id.*

 At the time of the incident in question, the law was clearly established that a police officer should use no more force than necessary to effect an arrest. *See, e.g., Adams v. Metiva* 31 F.3d 375, 386–87 (6th Cir.1994). Defendants' own

---

**6.** The Court is aware that this is contrary to the holding of *Ferguson v. Leiter,* 220 F.Supp.2d 875, 881 (N.D.Ohio 2002), upon which Defendants heavily rely. In *Ferguson,* the Court concluded that the right to be free from an unconstitutional excessive neck restraint was not clearly established. *Id.* The *Ferguson* court, however, did not reference the *Hope* opinion. The Court believes that *Ferguson* defines the issue too narrowly, and that based on *Hope* a court must look generally at the excessiveness of the conduct in light of the circumstances instead of focusing on whether the precise conduct at issue has previously been held unconstitutional.

expert opined that prior to Plaintiff's kick the Officers would not have been justified in using force against Plaintiff. (Lt. Weedman Dep. at 50–51.) A Level II or Level III neck restraint was not warranted prior to Plaintiff's kick, and the Court does not believe that any reasonable officer could have believed that such force was necessary under these circumstances.

### C.

■ Whether Whittaker is entitled to qualified immunity, therefore, necessarily depends on the nature and type of restraint he used against Plaintiff prior to the kick. Defendants rely heavily on their medical expert, Dr. Smock, to establish that Whittaker never applied any type of pressurized choke to Plaintiff. Dr. Smock stated that his review of the medical records did not reveal any evidence of injury to the anterior neck from the reported choke hold such as petechial hemorrhage (rupture of the small blood vessels in the neck), bruising to any area of the neck, and no complaints of difficulty swallowing or breathing. (Smock Dep. at 50–51.) Dr.

Smock opined that these types of injuries would normally be present if a "choke hold" had been applied. (*Id.*) Defendants argue that Dr. Smock's testimony provides irrefutable evidence that Whittaker was not applying pressure to Plaintiff's neck prior to the kick.[7]

■ Plaintiff concedes that the assumptions relied upon by Dr. Smock could perhaps prove that the force that Whittaker was applying around Plaintiff's neck did not cause his throat to collapse or cause Plaintiff to pass out. However, Plaintiff argues that Dr. Smock's testimony is not dispositive. Plaintiff relies on several photographs taken immediately after the incident which show "reddening" on his neck and throat areas to support his proposition that a reasonable jury could find that Whittaker was applying pressure to Plaintiff's neck. Plaintiff also relies on the fact that he kicked out to support this proposition. Bernard Clark, Plaintiff's martial arts expert, stated in his expert report that "jerking" or "kicking out" is a natural or instinctual response to a pressurized neck restraint.[8] (Clark Report at 10.)

7. The fact that the hold itself did not cause injury is relevant from an evidentiary standpoint because it provides some support to Defendants' argument that Whittaker did not apply pressure to Plaintiff's neck prior to the kick. The fact that hold did not substantially physically injure Plaintiff under the circumstances, however, is not directly relevant to the constitutional question of whether Whittaker used excessive force against Plaintiff under the circumstances. *See Baskin v. Smith*, 50 Fed.Appx. 731, 736–37 (6th Cir. 2002). ("A factor that is not crucial to an analysis of a claim for excessive force in violation of the Fourth Amendment is the extent of the injury inflicted.")

8. Defendants have moved to exclude the testimony of Mr. Clark. Defendants contend that Mr. Clark, a martial arts instructor, is not qualified to offer an opinion in this case. Mr. Clark offered various opinions about many of the central issues in this case. The majority of Mr. Clark's opinions do appear beyond his

expertise. This particular opinion, however, appears to be directly based on his experience and training in martial arts. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. Mr. Clark stated that his opinion that a kick or jerk is a natural response to a neck hold is based on his personal experience in martial arts training and his observations over the years. The evidence generally showed that the neck holds utilized by police are derived from martial arts. The Court concludes that Mr. Clark is qualified to offer a limited opinion regarding the types of bodily responses generally associated with

The "kick" or "jerk" occurs because the subject is trying to extricate himself from what the body perceives as a dangerous or life threatening situation. *Id.* The eyewitnesses are uncertain whether Whittaker was applying pressure on Plaintiff's neck, although Woodford Fultz indicated that Plaintiff's head was being pulled back by Whittaker. (Woodford Dep. at 4–6, 38–40, 49.) Understandably, Plaintiff has no memory of the incident.

In this case, there is a genuine issue of material fact as to the amount and type of force that Whittaker used prior to the kick. Admittedly, Dr. Smock's medical opinion that no pressure was applied to Plaintiff's neck is stronger and more credible than Plaintiff's evidence to the contrary. However, it is not the role of the Court to weigh the evidence or make credibility determinations. This is a job for the jury. The Court should only examine the record to determine if the evidence is so one-sided that the moving party must prevail as a matter of law. While it seems unlikely that a jury would disbelieve the Defendants' expert and accept Plaintiff's version of the events, it is not outside the realm of possibility. Summary judgment in this instance is inappropriate because the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury.

▮ Plaintiff appears to be arguing that even if Whittaker did not intentionally break Plaintiff's neck, he is nonetheless liable for his injuries because the type of hold he utilized caused Plaintiff to kick which resulted in the fall which produced his injuries. This theory is supported by

pressurized neck restraints based on his experience in martial arts.

**9.** While the fact that Plaintiff is raising incompatible theories of his case may weaken his position at trial, it does not have any legal effect at summary judgment so long as there is evidence to support his various theories.

evidence which is completely contrary to the theory that Whittaker's actions were intentional. The two theories are incompatible.[9] Such an argument also raises interesting causation and foreseeability issues. The medical and other expert testimony reveals that the most serious risks associated with neck restraints are strangulation and cardiac arrest type injuries caused by a reduction in air flow, not neck or spinal cord injuries. To what extent Plaintiff would be able to recover damages for his neck injury should he choose to proceed with this theory of the case at trial then is uncertain at this point. It is quite possible that Plaintiff might not be able to prove causation.

## IV.

In its previous opinion, the Court denied qualified immunity on Plaintiff's claim that Whittaker wrenched or twisted Plaintiff's neck in a move purposefully designed to cause either serious injury or which he knew was likely to cause serious injury. *See Fultz*, 187 F.Supp.2d at 705–06. Whittaker again moves for summary judgment on this portion of Plaintiff's excessive force claim arguing that Plaintiff has failed to identify any evidence in the record upon which a reasonable jury could find that Whittaker purposefully wrenched Plaintiff's neck.

▮ First, Whittaker argues that Gore's lay opinion that Whittaker deliberately broke Plaintiff's neck before he and Whittaker fell to the ground does not create an issue of material fact because the testimony is inadmissible. The fact that

Incompatible theories of the case can even be presented to the jury subject to instruction that the "jury's choice is limited to finding one or another of the theories supported, but not all." *Aetna Casualty Surety Company v. P & B Autobody*, 43 F.3d 1546, 1553 (1st Cir. 1994).

Gore may not have ever personally seen anyone's neck broken in the fashion she claims Plaintiff's neck was broken does not automatically render her eyewitness account of the events in question inadmissible. Gore may testify to what she observed. She can describe Whittaker's movements as well as the emotion in his face. Her exclamation, "they just broke his neck," would be an excited utterance admissible as a hearsay exception. *See* Fed.R.Evid. 803(2). As the Court previously noted, the fact that she may have uttered this pronouncement before the men fell suggests that Whittaker's neck may have been broken before Plaintiff hit the ground. *See Fultz*, 187 F.Supp.2d at 705–06.

Plaintiff's medical expert, Dr. Changaris, also provides some support to Plaintiff's theory of the case. Dr. Changaris does not believe that Plaintiff's injury was caused by the impact of Plaintiff's head with ground. He believes that Plaintiff's neck injury is consistent with a factual scenario in which a person is restrained from the back by a choke hold or neck restraint and the restraining party exerts a jerk or force to the neck. (Changaris Report at 1.) Dr. Changaris stated that the type of injury Plaintiff suffered implied an incredible situational force, and that Plaintiff's neck would had to have been twisted forcibly to produce such an injury. (Changaris Dep. at 14–15.) This evidence is in sharp contrast with Whittaker's emphatic assertion that he did not have his hands around Plaintiff's neck at any time. It also contradicts the opinions of Defendants' medical experts that Plaintiff's injury was caused by contact with the ground.

■ Quite simply, the viability of Plaintiff's claim that Whittaker intentionally broke his neck hinges on which evidence the jury believes. The jury could accept Whittaker's version of the events and the expert testimony that supports that version. Or, the jury could believe Plaintiff's version supported by his medical expert and the eyewitness accounts. This evidence does support the allegation that Whittaker intentionally broke his neck. There appears to be no middle ground. While it is difficult to conceive that a police officer would act in such a malicious and vindictive manner with no apparent motive other than sudden anger and frustration, the Court's role is not to determine whose side of the story is most believable. As such, the Court cannot say that as a matter of law Plaintiff could not prevail.

## V.

■ Nuss moves the Court to grant judgment as a matter law on Plaintiff's claim that Nuss is liable for failing to intervene to prevent Whittaker's alleged conduct. "Generally speaking, a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would or was being used; and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir.1997).

■ As to the first portion of Plaintiff's excessive force claim, Officer Whittaker's use of a neck restraint prior to the kick, the record is devoid of any suggestion that Nuss knew or should have known of the degree of force used by Whittaker to restrain Plaintiff. The Court has already concluded that use of a Level I type neck restraint with little or no pressure to the neck area was not excessive under these circumstances. To succeed on this portion of the claim Plaintiff will have to prove at trial that Whittaker was utilizing a Level II or Level III type pressurized restraint. To hold Nuss liable Plaintiff would have to prove that Nuss knew Whittaker was using a pressurized neck restraint. There is no evidence in the record to support such a

conclusion. Nuss denies that Whittaker was even restraining Plaintiff by the neck. Furthermore, even if Nuss had observed Whittaker holding Plaintiff by the neck, there is no evidence from which a reasonable jury could conclude that Nuss should have known what type of hold Whittaker was using. Even the eyewitnesses indicated that they could not say how much, if any, pressure Whittaker was applying on Plaintiff's neck. In particular, there is no evidence in the record that indicates Plaintiff cried out or indicated in any manner that the restraint was causing him pain. If such evidence was present one might be able to argue that Nuss should have known that Whittaker was using excessive force. Based on the evidence in the record, however, a jury simply could not reasonably conclude that Nuss knowingly failed to prevent the use of excessive force in these circumstances.

■■■ The record is also devoid of any evidence that supports imposing liability on Nuss based on his failure to prevent Whittaker from intentionally wrenching Plaintiff's neck. According to Nuss, he was unlocking the rear door of Whittaker's police vehicle when Plaintiff suddenly and without warning kicked Nuss in the right upper thigh. (Nuss dep. at 103.) Nuss then instinctively bent over to prevent further kicks to his groin area and only glanced up briefly to observe Whittaker grab Plaintiff around the chest. *Id.* at 105. According to Nuss, the kick happened so quickly that he was mainly concerned with assessing whether he was injured and preventing further kicks. *Id.* at 108. Plaintiff has not offered any evidence to contradict Nuss's account of these events. The eyewitness accounts support the crucial details of Nuss's version of the events. Everyone agrees that the events happened in a matter of seconds and that the kick and the alleged wrenching occurred almost simultaneously. By the time Nuss regained his composure the relevant events

were over for all intents and purposes. Nuss simply did not have ample time to prevent Whittaker's actions. Accordingly, Plaintiff cannot maintain a viable § 1983 action against Nuss for failing to prevent Whittaker from using excessive force.

## VI.

■■■ Defendant Oldham County has also moved for judgment as a matter of law on Plaintiff's failure to train and supervise claims. "[A] municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "Respondeat superior or vicarious liability will not attach under § 1983." *Id.* "Allegations that a particular officer was improperly trained are insufficient to prove liability, as are claims that a particular injury could have been avoided with better training." *Sova v. City of Mt. Pleasant,* 142 F.3d 898, 904 (6th Cir.1998). Only where a municipality's failure or to train or supervise its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. *See Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs v. Brown,* 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

In part, Plaintiff relies on the absence of specific language regarding the use of neck restraints in the Oldham County Police Department's Policy Manual to establish "deliberate indifference" by the municipality. Admittedly the policy is rather gener-

al.[10] As a practical matter, however, it would impossible for a single manual to cover the advisability of every police maneuver an officer may elect to use in the field and the precise circumstances under which such maneuvers can be used. The manual itself instructs the police officers to avoid the use of unnecessary force. Given the fairly particularized training police officers receive at the police academy in the use of neck restraints and other specific defense tactics, Oldham County's force policy is reasonable and certainly does not exhibit a deliberate indifference to the rights of Oldham County's citizenry. Had Plaintiff presented specific evidence that the municipality received complaints form its citizens about the use of neck restraints then Plaintiff would certainly have a much stronger argument that the municipality should have taken action or given its officers some clear instruction on the use of this specific defense tactic. The policy standing alone, however, is simply insufficient to establish that Oldham County disregarded a known risk that its officers would ignore their training at the police academy and improperly utilize neck restraints while in action on the field.

▉ Plaintiff also argues that Oldham County is liable for failing to train the officers in the use of neck restraints. This argument also fails to establish deliberate indifference by Oldham County. Defendants have come forward with evidence that the Kentucky Department of Criminal Justice Academy trains its officers with respect to various restraint techniques, including neck holds. Both Whittaker and Nuss received this training. Plaintiff has not demonstrated that Oldham County's failure to provide additional training on the use of neck restraints was so unreasonable as to constitute deliberate indifference. In all likelihood, any training provided by Oldham County would have been duplicative of the training already received by the officers at the police academy. Again, Plaintiff does not provide any evidence that prior to this incident, Oldham County should have been on notice that the training its officers had already received was deficient. There is no evidence in the record of any prior incidents involving neck restraints, and thus it cannot be said that Oldham County knew or should have known of a problem regarding its officers' training yet failed to implement corrective measures.

Plaintiff also argues that Oldham County's failure to adequately supervise its officers demonstrates indifference. Both Whittaker and Nuss were on probationary status as new officers at the time the subject incident took place.[11] The only

10. The policy provides in relevant part:
When an officer has a right to make an arrest, he may use whatever force is reasonably necessary to apprehend the offender or affect the arrest and no more: he must avoid using unnecessary violence. His privilege to use force is not limited to that amount of force necessary to protect himself, but extends to that amount reasonably necessary to enable him to perform his duty. If the offender resists, the officer may use such force as may be required under the circumstances to overcome resistance even to the extent of taking life, if that is necessary. He may not kill merely to prevent escape in misdemeanor cases, and cannot use violence when no resistance is offered. If he uses unnecessary and excessive force or acts wantonly and maliciously, he will be guilty of Assault and Battery, even of culpable homicide if he kills the person he is attempting to arrest.
(Oldham County Standard Procedures Manual at 28.)

11. Although it has now been substantially revised, former Section 23 of the Oldham County Police Standard Policy Manual regarding probationary police officers in effect at the time of the incident provided as follows:

A. Purpose
1. All newly appointed Police Officers will serve a one year probationary period.
2. To provide a formal and uniform on-the-job training period.

time either Nuss or Whittaker were under supervision was when they were initially hired. According to Nuss, he and other probationary officers merely rode with an experienced officer for a couple of weeks following their initial hire so they could familiarize themselves with the geography of Oldham County. (Nuss Dep. at 2, 22–22, 24.) Whittaker also testified that the probationary policy was not enforced against him as he was permitted to perform as a single unit during his probation.

■■■■■ A city's failure to follow its own internal policies does not amount to a constitutional violation. *See Barber v. City of Salem, Ohio,* 953 F.2d 232, 240 (6th Cir.1992). Oldham County's policy was certainly an admirable one, and if followed would have no doubt been a benefit to its officers and the community at large. However, Oldham County's failure to follow its own policies is not a per se constitutional violation. Plaintiff has not cited any authority which suggests a county's failure to supervise all new officers in a certain manner for a specified period of time amounts to deliberate indifference, especially where its officers are trained at the police academy and where the county has not received any complaints relating to the performance of new officers in the field. Oldham County's failure to follow its probation policy does not amount to deliberate indifference in this circumstance.

■■■■■ Finally, Plaintiff argues that Oldham County should be liable for failing to adequately investigate this incident. In some instances a failure to investigate can amount to deliberate indifference. A plaintiff must, however, prove "a pattern of violations from which a kind of tacit authorization by city policymakers can be inferred." *See Berry v. City of Detroit,* 25 F.3d 1342, 1354 (6th Cir.1994). This requires producing evidence that the county botched or failed to investigate more than the single incident in question. *See id.* This is so because evidence of a single incident cannot establish the existence of a policy or custom. *See City of Oklahoma City v. Tuttle,* 471 U.S. 808, 821, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). The record is completely devoid of any evidence that Oldham County regularly failed to investigate claims made against its officers.

3. To provide experience, guidance and supervision that the Probationary Officer may develop a high standard of judgment, conduct and appearance.
4. To aid in the evaluation of probationary personnel.
B. Procedure
1. All newly appointed Police Officers will serve a one year probationary period.
2. All newly appointed Police Officers will be assigned a Training Officer (or Senior Police Officer) in the proper methods of performance.
3. At the beginning of each work period the assigned field training officer will update the assigned shift supervisor as the probationary officer's status in learning to perform the requirements of the job.
4. No probationary officer will be allowed to perform as a single unit without permission of the shift supervisor and only then for a limited time in a situation which would not create any significant risk, (examples: traffic post, completing paper work, etc.) until all supervisors who have supervised the probationary officer agree that the probationary officer is ready to be released as a single unit.
a. No probationary officer will be permitted to work off-duty details without permission being given by the Chief of Police.
5. All probationary officers will be rated every month for the first three months and every three months thereafter, until they have successfully completed their first year of employment
a. Performance and capability will be the standard used when deciding on when a probationary officer can be released to work as a single unit.
(Oldham County Police Standard Manual § 23)

In short, Plaintiff has not come forward with any evidence to support his claim that Oldham County acted with deliberate indifference to the rights of its inhabitants.

## VII.

The Court now turns to Plaintiff's state law intentional tort claims against Whittaker and Nuss.

### A.

 Under Kentucky law, a "battery" is any unlawful touching of another. An individual is liable for "assault" under Kentucky law if his acts intend to cause a harmful or offensive contact. *Humphress v. United Parcel Service, Inc.,* 31 F.Supp.2d 1004 (W.D.Ky.1997). An "officer making an arrest may use such force as may be necessary to make the arrest but no more." *City of Lexington v. Gray,* 499 S.W.2d 72, 74 (Ky.1973). The use of physical force by a defendant upon another person is justifiable when the defendant believes that such force is necessary to protect himself against the use or imminent use of unlawful physical force by the other person. KRS 503.050(1). The use of physical force by a defendant upon another person is justifiable when the defendant is authorized to act as a police officer and he believes the force is necessary to prevent the escape of a person from a correctional facility. KRS 503.090(3). Although the state statutes referred to are justifications in defense of criminal charges for use of physical force, the same principles apply to Plaintiff's state law claim of civil assault and battery against Nuss and Whittaker.

 This Court has already determined that Nuss and Whittaker acted appropriately under the circumstances prior to Whittaker's alleged restraint of Plaintiff around the neck. *See Fultz,* 187 F.Supp.2d. at 702. Thus, Plaintiff's assault and battery claim must be dismissed to the extent that it relates to any perceived or actual contact that occurred to his person prior to Whittaker taking Plaintiff by the neck. Since Plaintiff does not allege that Nuss ever physically touched Plaintiff after that time, the assault and battery claims must be dismissed as they relate to Nuss. The analysis of the assault and battery as it relates to Whittaker will be same as that for qualified immunity. For those same reasons, the "assault and battery" claim survives as against Whittaker.

### B.

 The Court next turns to Plaintiff's false arrest claim against Nuss and Whittaker.. An action for false arrest may only be maintained where the imprisonment is without legal authority, *i.e.,* where there is no valid or apparently valid power to arrest under the circumstances. *See Smith v. Stokes,* 54 S.W.3d 565, 567 (Ky. App.2001). "A person is guilty of menacing when he intentionally places another person in reasonable apprehension of imminent physical injury." KRS 508.050. This Court already determined a reasonable and prudent officer would have probable cause to arrest Plaintiff for menacing based on the circumstances and Plaintiff's physical movements toward the officers. *Fultz,* 187 F.Supp.2d. at 703. The want of lawful authority to arrest is an essential element in an action for false arrest, therefore, Plaintiff's false arrest claim must be dismissed.

### C.

 Finally, the Court addresses Plaintiff's claim against Nuss and Whittaker for outrageous conduct. To prevail on this claim Plaintiff must show that "defendant's conduct was intentional or reckless, that the conduct was so outrageous and intolerable so as to offend generally accepted standards of morality and decency, that a causal connection exists between the

conduct complained of and the distress suffered, and that the resulting emotional stress was severe." *Brewer v. Hillard,* 15 S.W.3d 1, 6 (Ky.App.1999). An action for outrage will not lie for "petty insults, unkind words and minor indignities." *Kroger Co. v. Willgruber,* 920 S.W.2d 61, 65 (Ky.1996). The action only lies for conduct which is truly "outrageous and intolerable." *Id.* Kentucky courts have often classified the tort of outrage as "a gap filler" intended only to provide a remedy when no other tort is adequate. *Rigazio v. Archdiocese of Louisville,* 853 S.W.2d 295 (Ky.App.1993). This is not to say that a plaintiff can never recover for the tort of outrage where a traditional tort would also be available under the circumstances. *See Brewer* 15 S.W.3d at 6–7. Rather, it is the intent of the actor that governs whether the tort of outrage is available. *See id.* As explained by the *Rigazio* court:

> where an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and *the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie.* Recovery for emotional distress in those instances must be had under the appropriate traditional common law action.

*Rigazio,* 853 S.W.2d at 299 (emphasis added). Thus, an action for the tort of outrage might lie where an unwanted or unlawful touching occurred if the action or contact by the defendant was intended only to cause extreme emotional distress in the victim. *See Brewer* 15 S.W.3d at 6–7. In this case, Plaintiff has not presented any evidence from which a jury could infer that Nuss or Whittaker's actions were motivated solely by a desire to cause Plaintiff emotional distress. Indeed Plaintiff's own theory of the case is that Whittaker acted, at least in part, from a desire to physically injure Plaintiff. Accordingly, Plaintiff cannot pursue a claim against Whittaker and Nuss for the tort of outrage.

The Court will enter an order consistent with this Memorandum Opinion.

## ORDER

Defendants have moved for summary judgment on a variety of grounds, including qualified immunity. In summary, material issues of disputed fact preclude the Court from granting qualified immunity to Defendant Whittaker on Plaintiff's claim that Whittaker used excessive force in restraining Plaintiff by the neck and intentionally wrenching his neck. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendant Whittaker's motion for summary judgment is SUSTAINED IN PART; all Plaintiff's state law claims against Defendant Whittaker are DISMISSED WITH PREJUDICE except Plaintiff's claim for assault and battery; and Defendant Whittaker's motion for qualified immunity is DENIED.

IT IS FURTHER ORDERED that Defendant Nuss's motion for summary judgment is SUSTAINED and the constitutional and state law claims against Defendant Nuss are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Defendant Oldham County Fiscal Court's motion for summary judgment is SUSTAINED and the constitutional claims against Defendant Oldham County Fiscal Court are DISMISSED WITH PREJUDICE.