**Scott MAGRUM, Plaintiff,**

v.

**Chris MEINKE, Defendant.**

**No. 3:03CV7306.**

United States District Court, N.D. Ohio, Western Division.

Aug. 27, 2004.

---

Mark P. Herron, Cleveland, OH, for Plaintiff.

Teresa L. Grigsby, Toledo, OH, for Defendant.

## MEMORANDUM OPINION

KATZ, District Judge.

Pending before the Court is Defendant's motion for summary judgment (Doc. No. 40) as to which Plaintiff has filed an opposition (Doc. No. 44) and Defendant has filed a reply (Doc. No. 49). The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367. For the reasons stated below, Defendant's motion will be denied.

### BACKGROUND

This case arises out of a routine traffic stop that escalated into much more. The parties' versions of events, on which resolution of Defendant's motion depends, substantially diverge. As a consequence, the Court presents a more detailed rendition of events from each side's perspective.

Plaintiff Scott Magrum ("Magrum") was traveling on Lime Road through Woodville, Ohio ("Woodville"). Magrum was ac-companied by his girlfriend Lyla Hamilton ("Hamilton"), daughter Amanda Kauffman ("Amanda"), son-in-law Shawn Kauffman ("Shawn"), and three grandchildren. Defendant Chris Meinke ("Meinke"), who is a police officer in Woodville, was on patrol when he witnessed Plaintiff's van approaching from the opposite direction at a speed greater than the posted limit. Meinke turned on his radar, which indicated Magrum was driving thirty-six (36) miles per hour in a twenty-five (25) mile per hour speed zone. Meinke radioed dispatch with his location and the license plate number on Magrum's van. Plaintiff turned into an alley, and then into a private driveway. Defendant approached the driver's side of the van.

According to Plaintiff, Meinke indicated that he had been stopped for speeding, which Magrum denied. Defendant requested Magrum's driver's license and registration, and contends Plaintiff complied only after being provided with the aforementioned explanation. Meinke asked Magrum to exit the van to conclude the matter and be on his way. (Doc. No. 36, Magrum Dep., p. 42). Plaintiff insists that he did so cooperatively, but when he reached the rear of the van Meinke informed him he was under arrest. *Id.* at 42–44. Defendant was going to handcuff Plaintiff behind his back. Magrum was ultimately handcuffed in front after informing Meinke that he had a shoulder injury, and maintains that he did not resist. *Id.* at 45–46, 48, 55.

After being handcuffed, Plaintiff asserts that he asked why he was under arrest following which Defendant became nasty and angry, and informed him that it was for driving with a suspended license and on an outstanding warrant. *Id.* at 45, 48–49. Plaintiff argues that Meinke then grabbed him by the handcuffs and/or wrists and flipped him over his right shoulder. *Id.* at 45, 48–50, and that Defendant

then placed his knee in Magrum's back and began choking him with his forearm, causing Plaintiff to pass out and/or see black flashes. *Id.* at 51, 53–54, 56. Plaintiff claims that Meinke threatened to dislocate his shoulder. *Id.* at 51, 53. Magrum acknowledges that he tried to get up, asserting that he could not breathe. (Doc. No. 36, Magrum Dep., p. 52; Doc. No. 31, S. Kauffman Dep., p. 28; Doc. No. 35, A. Kauffman Dep., p. 31).

Plaintiff claims Meinke then picked him up on "tippy toes," and began escorting him toward Meinke's police cruiser. Magrum insists he was cooperating with Meinke at this point. (Doc. No. 36, Magrum Dep., pp. 56–57). Despite this, Magrum claims, Meinke unexpectedly flipped him to the ground again and proceeded to choke him into unconsciousness a second time, during which Magrum claims he made no attempt to rise or resist. (Doc. No. 36, Magrum Dep., pp. 52, 56–60). Hamilton, Amanda and Shawn confirm Plaintiff's position that Meinke slammed him to the ground and choked him twice. (Doc. No. 28, Hamilton Dep., pp. 21–26, 30–31; Doc. No. 31, S. Kauffman Dep., pp. 24, 28, 32–33; Doc. No. 35, A. Kauffman Dep., pp. 28–31, 34–35). Shawn confirms that after Meinke took Magrum to the ground for the second time and began choking him again, Shawn did not see Magrum move. (Doc. No. 31, S. Kauffman Dep., pp. 32, 34).

According to Magrum and Amanda, Meinke choked Magrum on the ground the second time for approximately five (5) minutes, while swearing at Magrum. (Doc. No. 36, Magrum Dep., pp. 60–61; Doc. No. 35, A. Kauffman Dep., pp. 34, 36). During this time, Magrum claims he passed in and out of consciousness. (Doc. No. 36, Magrum Dep., p. 59). Amanda confirms that Magrum appeared to go limp and then come to while on the ground under Meinke. (Doc. No. 35, A. Kauffman Dep.,

pp. 33, 35; Doc. No.). Defendant called for back up, and Plaintiff was placed in the back of Meinke's patrol car.

Meinke, however, presents a very different picture. Although he did not activate his emergency lights until Plaintiff turned off of Lime Road, Defendant maintains that Magrum did not immediately stop. (Doc. No. 29, Meinke Dep., pp. 61–62). Once he stopped, Meinke approached Plaintiff's van and saw a lot of movement inside. *Id.* at 48–49. He asked for Magrum's license and registration, then returned to his patrol car. Dispatch informed him that Magrum was driving with a suspended license, had a civil protection order against him as well as an outstanding warrant with a caution indicator that Plaintiff had been previously charged with felonious assault. *Id.* at 52–55. Meinke then requested Magrum to step out of the van, which he did after initially failing to comply and asking why he was being detained. *Id.* at 58–60. Defendant "started to become a little apprehensive with the totality of the circumstances up to that point." *Id.* at 60.

When Defendant informed Magrum that he would be taken into custody, Magrum became nervous as evidenced by his voice cracking, use of descriptive/animated hand gestures and adjusting his standing position. *Id.* at 67, 70–73. The possibility that Plaintiff might run or even attack arose in Meinke's mind. *Id.* at 73. He asked Plaintiff to place his hands on the patrol car's trunk; Magrum initially refused. *Id.* at 78–79. After Magrum put his hands on the trunk, Meinke attempted to frisk him, but Plaintiff kept taking his right hand off the trunk. *Id.* at 79–80. Defendant construed this as a further possibility that Magrum might flee or fight, and felt it was unsafe to continue frisking Plaintiff without placing him in handcuffs. *Id.* at 80–82.

Meinke then handcuffed him in front after Magrum informed him his right

shoulder was injured. Magrum insisted that his license could not be suspended. (Doc. No. 29, Meinke Dep., pp. 86, 88; Doc. No. 41, Ex. G, Police Report, pp. 1–2).[1] Defendant completed the handcuffing process, even though Plaintiff resisted by placing his palms facing down rather than inward. (Doc. No. 29, Meinke Dep., pp. 89–90). Shawn acknowledges that Plaintiff was loudly asking why he was being arrested. (Doc. No. 31, S. Kauffman Dep., pp. 24–25). Meinke felt something soft balled up in Plaintiff's right pocket. (Doc. No. 29, Meinke Dep., p. 91; Doc. No. 41, Ex. G, Police Report, p. 2). Magrum pushed Defendant's hand away and took a step back, to which Defendant responded by grabbing the handcuffs in the event Plaintiff decided to flee. (Doc. No. 29, Meinke Dep., pp. 91, 94–96; Doc. No. 41, Ex. G, Police Report, p. 2). Hamilton acknowledges that Plaintiff "may have taken a step back." (Doc. No. 28, Hamilton Dep., p. 26). The soft ball in Magrum's pocket turned out to be a bag containing Marijuana. (Doc. No. 36, Magrum Dep., p. 67).

Plaintiff then purportedly took two small steps toward Meinke and raised "his hands as if to shove" Defendant. (Doc. No. 29, Meinke Dep., pp. 96–97; Doc. No. 41, Ex. G, Police Report, p. 2). Meinke, fearing for his physical safety, tried to restrain Plaintiff. (Doc. No. 29, Meinke Dep., pp. 97; Doc. No. 41, Ex. G, Police Report, p. 2). Defendant claims that he then executed a takedown maneuver, pulling Plaintiff to the ground and placing Magrum on his stomach. (Doc. No. 30, Meinke Dep. pp. 111–12; Doc. No. 41, Ex. F., Faulkner Aff., ¶ 10).[2] Meinke insists that Magrum began to struggle violently. (Doc. No. 29, Meinke Dep., p. 113; Doc. No. 41, Ex. G, Police Report, p. 2). Magrum began shouting "let me the fuck go," and "I didn't do a fucking thing." (Doc. No. 41, Ex. G, Police Report, p. 2).

Angela Meyer, another individual who witnessed the incident, testified that "it just looked like to me that he was trying to fight, resist his arrest." (Doc. No. 32, Meyer Dep., p. 21). Defendant denies placing Plaintiff in a choke hold or having his arms around his neck. (Doc. No. 29, Meinke Dep., pp. 116–17). He employed, at most, a head or neck repositioning technique, not a "sleeper hold" or "choke hold." (Doc. No. 41, Ex. F, Faulkner Aff., ¶¶ 14–15). Meinke called for back up. (Doc. No. 36, Meinke Dep., pp. 118–19). Magrum eventually ceased resisting and was placed in Defendant's patrol car. (Doc. No. 41, Ex. G, Police Report, p. 2).

Plaintiff concedes that the bag of marijuana was found in the patrol car. A search of the van also revealed two partially smoked marijuana cigarettes. Magrum was transported to the Woodville Police Department. Emergency medical services was called after he complained of pain in his chest, and he was taken to Fremont Memorial Hospital where he was x-rayed and examined.[3] He was released back into

---

1. Kimberly Roper, who witnessed the incident, testified that Magrum resisted Mainke's attempt to get Magrum to move his hands off the car to be handcuffed behind his back. (Doc. No. 33, Roper Dep., p. 16).

2. Defendant has submitted an affidavit from Samuel D. Faulkner ("Faulkner"), a police training expert, currently employed with the Ohio Peace Officer Training Academy. (Doc. No. 41, Ex. F, Faulkner Aff., ¶ 3).

3. Plaintiff contends that he was bleeding and experiencing pain in his knees, elbows, wrists, chest and ribs, forearms, forehead, mouth and back as a result of being flipped. (Doc. No. 36, Magrum Dep., pp. 59–60, 68–72). Magrum also insists that he experienced tingling in his fingers, and now has trouble picking things up and gripping. *Id.* at 71, 107. Meinke sustained abrasions and bleeding on his left elbow, knuckles on both hands and an abrasion on his left knee. (Doc. No. 30, Meinke Dep., pp. 127, 131).

police custody. Plaintiff took photos of his injuries, and had two subsequent appointments with his own physician, Duane L. Sander ("Sander").

As a result of this incident, Magrum was charged with and pled no contest to resisting arrest, aggravated menacing (reduced from causing physical harm to a police officer), possession of marijuana and drug paraphernalia, and obstructing official business. (Doc. No. 41, Exs.A–E). Plaintiff now seeks redress pursuant to 42 U.S.C. § 1983 for alleged violations of his Fourth Amendment right against the use of excessive force.[4] Plaintiff also sets forth a state law claim for assault and battery.

### DISCUSSION

#### A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Ca-*

trett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323–25, 106 S.Ct. 2548. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2541, 91 L.Ed.2d 202 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *see also Harris v. General Motors Corp.,* 201 F.3d 800, 802 (6th Cir.2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

---

4. The statute provides in relevant part:

 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

 42 U.S.C. § 1983. To establish a claim against a public official under § 1983, Plaintiff must prove that the conduct complained of was: (1) committed by a person acting under the color of state law; which (2) deprived him of a federally protected constitutional or statutory right. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Flint v. Ky. Dep't of Corr.,* 270 F.3d 340, 351 (6th Cir.2001); *Weberg v. Franks,* 229 F.3d 514, 522 (6th Cir.2000).

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F.Supp.2d 1069, 1071 (E.D.Mich.2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir.1994) (quoting *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505); therefore, "[t]he Court is not required or permitted ... to judge the evidence or make findings of fact." *Williams*, 154 F.Supp.2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F.Supp.2d 928, 930 (S.D.Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir.2000).

### B. QUALIFIED IMMUNITY

■ Qualified immunity is an affirmative defense that shields public officials performing discretionary functions from civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court made clear that "[i]n a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in a proper sequence." The Sixth Circuit has adopted a three-step inquiry for determining an appropriate defense of qualified immunity:

> *First*, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. *Second*, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. *Third*, we determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir.2003) (quoting *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir.1999) (en banc)) (emphasis added); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d at 899 (6th Cir. 2004). "If the answer to all three questions is 'yes,' qualified immunity is not proper." *Champion*, 380 F.3d at 899,.

■ While the issue of whether a defendant is entitled to qualified immunity is usually a purely legal question to be determined by the court, summary judgment is inappropriate where "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury." *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir.1994) (citing to *Brandenburg v. Cureton*, 882 F.2d 211, 215–16 (6th Cir. 1989)). In other words, if, under Plaintiff's version of the disputed facts, Defendant is not entitled to qualified immunity, a genuine issue of material fact exists and the court may not grant summary judgment for Defendant. The Court, therefore, bases its qualified immunity inquiry upon the facts taken in the light most favorable to the Plaintiff, drawing all inferences in

Plaintiff's favor. *Champion,* 380 F.3d at 899–900.

1. Occurrence of a Constitutional Violation

■ Under the first prong of the qualified immunity analysis, the Court must determine whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151 (citing *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)). Magrum asserts that Meinke violated his Fourth Amendment right against the use of excessive force when Defendant allegedly flipped and choked him. Therefore, the question in the case *sub judice* is whether Magrum has stated a valid claim of excessive force under the Fourth Amendment.

■ The Court is mindful that the United States Supreme Court clarified the qualified immunity inquiry in the context of an excessive force case in *Saucier.* While an excessive force claim is to be determined under an objective reasonableness standard, *see Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the focus of a qualified immunity analysis, while similar, "has a further dimension":

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable,

however, the officer is entitled to the immunity defense.

*Saucier,* 533 U.S. at 205, 121 S.Ct. 2151.

■ Since ascertaining the reasonableness of force used is not capable of precise definition or mechanical application, the analysis focuses on the specific facts of each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865.

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, nor by the mistaken execution of a valid search warrant on the wrong premises. With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.
>
> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

*Id.* at 396–97, 109 S.Ct. 1865 (internal citations omitted). In *Saucier*, the Court also made clear that "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier*, 533 U.S. at 205, 121 S.Ct. 2151. The label attributed to Defendant's actions is irrelevant as long as the amount of force used was reasonable. *See Palshook v. Jarrett*, 120 F.Supp.2d 641, 655 (N.D.2000).

In *Joy v. City of Dayton*, No. C–3–90–132, 1991 WL 1092505, 1991 U.S. Dist. LEXIS 21765, at *15 (S.D.Ohio June 28, 1991), the court granted summary judgment where a plaintiff resisted arrest and a struggle ensued despite one of the plaintiff's witnesses testifying that an officer "place[d] 'a black object, either a nightstick or a flashlight,' over Randy's throat in an effort to subdue him." *Id.* at *15. The *Joy* court stated:

> [E]ven if a flashlight or nightstick was used in subduing Randy Joy, there is still no evidence that excessive force was employed at this time. While Cheryl and Robert Joy both aver, in their affidavits, that Hopper "choked" Randy, they do not indicate (and there is no independent evidence) that the choking was excessive under the circumstances, or that it continued after Randy had ceased to resist arrest.

*Id.* at *16.

 Meinke points out that the extent of a plaintiff's injury is considered within the Sixth Circuit in adjudicating excessive force claims. *See Neague v. Cynkar*, 258 F.3d 504, 508 (6th Cir.2001); *Lyons v. City of Xenia*, 90 Fed. Appx. 835, 842–43 (6th Cir.2004); *see also Pannell v. City of Bellvue*, 184 F.Supp.2d 686, 688 (N.D.Ohio 2002); *Palshook*, 120 F.Supp.2d at 655–56. The Court observes, however, "that a plaintiff may allege use of excessive force even where the physical contact between the parties did not leave excessive marks or cause extensive physical damage." *Ingram v. City of Columbus*, 185 F.3d 579, 597 (6th Cir.1999). "A factor that is not crucial to an analysis of a claim for excessive force in violation of the Fourth Amendment is the extent of injury inflicted." *Baskin v. Smith*, 50 Fed. Appx. 731, 737 n. 2 (6th Cir. Nov. 8, 2002).

In *Fultz v. Whittaker*, 261 F.Supp.2d, 767, 777 (W.D.Ky.2003), the defendants, relying on their medical expert, asserted that "the medical records did not reveal any evidence of injury to the anterior neck from the reported choke hold such as petechial hemorrhage [ ], bruising to any area of the neck, and no complaints of difficulty swallowing or breathing." The defendants insisted that this "testimony provides irrefutable evidence that Whittaker was not applying pressure" to the plaintiff's neck. *Id.* The plaintiff countered with photos showing reddening on his neck, the testimony of a martial arts expert that plaintiff's " 'jerking' or 'kicking out' is a natural or instinctual response to a pressurized neck restraint" and eyewitness testimony that the defendant was pulling the plaintiff's head back. *Id.* at 777–78. The *Fultz* court concluded:

> Admittedly, [the defendants' expert's] medical opinion that no pressure was applied to [the plaintiff's] neck is stronger and more credible than [the plaintiff's] evidence to contrary. However, it is not the role of the [c]ourt to weigh the evidence or make credibility determinations.

*Id.* at 778.

In the case *sub judice*, it is undisputed that Magrum pulled his van off the main road into a public alley and stopped in a private driveway; he did not immediately stop when Defendant activated his emergency lights. There was a lot of movement in the van. In response to Meinke's

request for Plaintiff's driver's license and registration Magrum asked why, and denied he was speeding. Dispatch informed Defendant that Plaintiff was driving with a suspended license, subject to a protection order as well as an outstanding warrant that included a caution indicator that Magrum had been previously charged with felonious assault. Magrum does not dispute that he adjusted his standing position, and his voice began to crack when informed he would be handcuffed. It is also undisputed that Magrum argued loudly with Defendant regarding the reason for his arrest, and may have taken a step back after being handcuffed. Plaintiff also tried to get up after Meinke took him to the ground [5].

If, together with these undisputed facts, a jury accepts Defendant's and his witnesses' rendition of events, then the use of a takedown maneuver and neck repositioning technique was objectively reasonable. Meinke also offers Faulkner's expert testimony (Doc. No. 41, Ex. F, Faulkner Aff., ¶¶ 10–18), which Plaintiff does not rebut with any expert testimony of his own.

For purposes of this motion, however, the Court must view the facts in a light most favorable to Magrum, drawing all inferences in his favor. Plaintiff, Hamilton, Amanda, and Shawn all contend that Meinke flipped Magrum and severely choked him two times, with Plaintiff and Amanda both approximating that Meinke choked Magrum for around five minutes each time. Plaintiff and Amanda contend that Magrum lapsed into unconsciousness as he was being choked. Plaintiff claims he was cooperating as he was being led on his "tippy toes" to Meinke's patrol car and that Meinke flipped him to the ground the second time out of the blue. Shawn and Plaintiff both claim Magrum was "out" and did not resist while on the ground for the second time.

Magrum required medical assistance that evening and followed up with Dr. Sander. Plaintiff "complained of his throat being somewhat sore still" at his first visit. (Doc. No. 34, Sander Dep., p. 15). Sander also observed that ecchymosis, or bruising, up near the shoulder and above, might indicate that Plaintiff suffered a neck injury. *Id.* at 55–56. He also acknowledged that the aforementioned muscle strain could be "consistent with being choked and thrown on the ground." *Id.* at 59.

■ Under the circumstances presented here, i.e., a traffic stop during which an officer learns that a driver is driving under suspension and has an outstanding warrant for felonious assault, scuffles with the driver, then flips the already-handcuffed and presently cooperative driver to the ground and chokes him into unconsciousness for a period of minutes, during which time the driver puts up no further resistance, a jury could find the amount of force employed was not reasonable and therefore gives rise to an excessive force claim. Moreover, an officer perceiving the facts as Plaintiff presents them would have no basis for arguing that he mistakenly, but reasonably, believed the amount force used was necessary. Whether the officer "flipped" the driver or used a "take-down technique," as Defendant asserts, the result would be the same.

In short, while a genuine factual dispute exists, viewing the facts in a light most favorable to Plaintiff, the Court determines that Magrum has demonstrated that he was subjected to excessive force in vio-

---

**5.** Magrum pled no contest to the charge of resisting arrest. (Doc. No. 41, Ex. A). Pleading no contest, however, does not necessarily foreclose the possibility that a jury may find that Defendant used excessive force. *See Sigley v. Kuhn,* No. 98–3977/99–3531, 205 F.3d 1341, 2000 U.S.App. LEXIS 1465, at *9 (6th Cir. Jan. 31, 2000).

lation of his Fourth Amendment rights. As a consequence, the Court must now determine whether such a right was clearly established at the time in question.

## 2. "Clearly Established" Right

■ Even if he did violate Plaintiffs' Fourth Amendment right against excessive force, Meinke claims he is unaware of any Sixth Circuit precedent putting him on notice that the use of a takedown procedure and head or neck repositioning technique violated Magrum's rights.

For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell v. Forsyth,* 472 U.S. 511, 535, 105 S.Ct. 2806, n. 12, 86 L.Ed.2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

Officers sued in a civil action for damages under 42 U.S.C. § 1983 have the same right to fair notice as do defendants charged with the criminal offense defined in 18 U.S.C. § 242. Section 242 makes it a crime for a state official to act "willfully" and under color of law to deprive a person of rights protected by the Constitution. In *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), we held that the defendant was entitled to "fair warning" that his conduct deprived his victim of a constitutional right, and the standard for determining the adequacy of that warning was the same as the standard for

determining whether a constitutional right was "clearly established" in civil litigation under § 1983.

*Hope v. Pelzer,* 536 U.S. 730, 739–40, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (footnote omitted). The *Hope* Court further asserted:

In some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary. But general statements of the law are not inherently incapable of giving fair warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question even though 'the very action in question has [not] previously been held unlawful.'

Our opinion in *Lanier* thus makes clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in *Lanier,* we expressly rejected a requirement that previous cases be "fundamentally" similar. Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with "materially similar" facts.

*Id.* at 741, 122 S.Ct. 2508. (citation omitted); *see also Toms v. Taft,* 338 F.3d 519, 525 (6th Cir.2003). "In determining whether a constitutional right is clearly established, we 'look [ ] first to the decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.' " *Bell v. Johnson,* 308 F.3d 594, 602 (6th Cir.2002) (quoting *Chappel v. Montgomery County Fire Prot. Dist. No. 1,* 131 F.3d 564, 579 (6th Cir.1997)).[6]

---

**6.** Other sources such as training the officer has received may also establish a right as clearly established. *Champion,* 380 F.3d at

902,. However, in the case *sub judice,* the record is silent on the specifics of any training

Defendant directs the Court to *Ferguson v. Leiter*, 220 F.Supp.2d 875 (N.D.Ohio 2002), *Hale v. Vance*, 267 F.Supp.2d 725 (S.D.Ohio 2003), and *Joy, supra*, for the proposition that a reasonable officer in Meinke's position would have concluded that the amount of force employed was lawful. In *Hale*, the court determined that the use of a choke hold, or escort position, in the context of a Terry stop might give rise to an excessive force claim. The officer, however, was still entitled to qualified immunity because the court could not "say that it was clearly established as of February 20, 2001, that a police officer may not detain an individual exiting a house reportedly providing sanctuary for at least one suspect in an investigation of gunshots by placing her arm behind her back and holding her in a choke hold." *Hale*, 267 F.Supp.2d at 735.

Likewise, in *Ferguson*, though the use of a neck hold under the circumstances presented therein might have constituted excessive force, the officer was still entitled to qualified immunity. This Court framed the inquiry for purposes of the second part of the qualified immunity analysis as:

> [W]hether a reasonable officer could have believed that using a chokehold to subdue a person resisting arrest, under arrest, under the particular circumstances presented in [that] case, was lawful "in light of clearly established law and the information the officer [ ] possessed."

*Ferguson*, 220 F.Supp.2d at 882. In reaching its conclusion, this Court observed that the "[p]laintiffs have not presented relevant, controlling authority from this jurisdiction, or a consensus from other jurisdictions, regarding the constitutionality of neckholds." *Id.* at 883.

Subsequently, however, the *Fultz* court, relying on *Hope*, declined to follow *Ferguson*, even though "there was no direct precedent from the Sixth Circuit or Supreme Court directly dealing with the constitutionality of neck restraints." *Fultz*, 261 F.Supp.2d at 776. Instead the *Fultz* court focused on general excessiveness of the conduct in light of the circumstances presented, and noted that "[a]t the time of the incident in question, the law was clearly established that a police officer should use no more force than necessary to effect an arrest." *Id.* (citing *Adams v. Metiva*, 31 F.3d 375, 386–87 (6th Cir.1994)).

Upon further consideration, and in light of *Hope*, the Court agrees with *Fultz's* analytical framework. If, as Defendant contends, he employed a takedown maneuver together with a head or neck repositioning technique, then Meinke did not act contrary to any clearly established standards. However, under Plaintiff's version of events, in which Meinke flipped Magrum to the ground and choked him two times, the second time while Magrum was not resisting, Defendant acted in violation of clearly established law.

### 3. Sufficiency of Evidence

Plaintiff points to deposition testimony in which Plaintiff and his corroborating witnesses claim that Meinke took Magrum to the ground and choked him twice. Plaintiff testified that he cooperated with Meinke while being led on his "tippy toes" to Meinke's cruiser. Plaintiff and Shawn testified that Magrum did not resist or struggle while being choked the second time. Plaintiff and Amanda testified that Magrum lapsed into unconsciousness while Meinke continued to choke him, and that the choking lasted for approximately five minutes. As discussed above, this evidence is sufficient "to indicate that what the official allegedly did was objectively unreasonable in light of clearly established

Meinke may have received regarding take-

down maneuvers or neck holds.

constitutional rights." *See Feathers,* 319 F.3d at 848.

In sum, the evidence taken in the light most favorable to the Plaintiff shows that Defendant's actions under the circumstances violated the clearly established constitutional right of Plaintiff to be free from excessive force. A genuine material issue of fact therefore exists. Accordingly, Defendant's motion for summary judgment on Plaintiff's Fourth Amendment excessive force claim is denied.

## C. ASSAULT AND BATTERY CLAIM

Plaintiff's state law claim for assault and battery rises and falls with Magrum's Fourth Amendment claim. O.R.C. § 2744.03 provides in relevant part:

(A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to persons or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:

$\qquad$ * $\qquad$ * $\qquad$ * $\qquad$ * $\qquad$ * $\qquad$ *

(6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:

(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

(c) Liability is expressly imposed upon the employee by a section of the Revised Code.

OHIO REV. CODE § 2744.03(A)(6)(a)-(c).

The term "malice" is defined as the "willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." *Jackson v. Butler Cty. Bd. of Cty. Commrs.* (1991), 76 Ohio App.3d 448, 453–454, 602 N.E.2d 363. The definition of "bad faith" is "the opposite of 'good faith,' generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, * * * not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." Black's Law Dictionary (5 Ed.1979), 127. Also, and by way of analogy to insurance law, "bad faith" is that for which there is no "reasonable justification." *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 554, 644 N.E.2d 397. "Reckless" is defined as " 'disregard of the safety to others if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.' " *Thompson v. McNeill* (1990), 53 Ohio St.3d 102, 104–105, 559 N.E.2d 705. Further, "the term 'reckless' is often used interchangeably with * * * 'wanton.' " The definition of "reckless," set forth above, applies equally to the conduct characterized as "wanton." *Id.* at 104, 559 N.E.2d 705.

*Hicks v. Leffler,* 119 Ohio App.3d 424, 695 N.E.2d 777, 780 (1997).

However, "[i]f an officer uses more force than is necessary to make an arrest and protect himself from injury, he is liable for assault and battery ..." *D'Agastino v. City of Warren,* 75 Fed. Appx. 990, 995 (6th Cir.2003) (quoting *City of Cincinnati v. Nelson,* No. C–74321, 1975 Ohio App. LEXIS 7443, at *5 (Ohio Ct. App. 1st Dist May 5, 1975)); *see also Drolesbaugh v. Hill,* 64 Ohio St. 257, 60 N.E. 202, 203 (Ohio 1901); *Schweder v. Baratko,* 103 Ohio App. 399, 143 N.E.2d 486, 489 (1957). The Court has already determined that there remains a genuine factual dispute as to whether Meinke used excessive force. Defendant is, therefore, not entitled to either state law immunity or summary judgment on Plaintiff's state law claim for assault and battery.

### CONCLUSION

For the reasons state above, Defendant's motion for summary judgment (Doc. No. 40) is denied.

IT IS SO ORDERED.